## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KENT GARVEY, ALBERT OVERHAUSER, JAMES T. MARSH, AND THOMAS LOVELESS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>            Plaintiffs,<br><br><br><br>JAMES ARKOOSH AND DIOMED HOLDINGS, INC.,<br><br>            Defendants. | Master File No. 1:04-cv-10438 (RGS)<br><br><br>Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Lead Plaintiffs Kent Garvey, Albert Overhauser, James T. Marsh, Roger E. Buck, and Thomas Loveless ("Plaintiffs") respectfully submit this memorandum of law in opposition to the motion of James Arkoosh and Diomed Holdings, Inc. ("Diomed") (collectively referred to as "Defendants") to dismiss the amended complaint.

## STATEMENT OF FACTS

Plaintiffs bring a class action complaint under §10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder against Diomed and its chairman and "financial consultant" James Arkoosh. During the relevant time period, Arkoosh also acted as Chief Financial Officer and Chief Operating officer of Verus International Group Ltd., the largest single shareholder of Diomed with 15.2% of its stock. (Compl. ¶18).

Plaintiffs' claims arise out a scheme engineered by Arkoosh to manipulate the market of Diomed stock by secretly paying stock market analysts to disseminate what appeared to be impartial research reports urging investors to buy Diomed stock.   Plaintiffs allege that such conduct violates

§10(b) and Rule 10b-5(a)-(c) for failing to disclose Defendant's stock promotion activities and for engaging in a scheme and course of conduct designed to unlawfully manipulate the market price of Diomed securities.

On February 14, 2002, Diomed completed a reverse merger with a Vancouver based shell company traded on the OTC Bulletin Board named Netaxco Corp. (Compl. ¶¶20-21). The merger was arranged by Arkoosh and Verus.  Simultaneous with the merger, Diomed completed a private offering of common stock at $2.00 per share raising $10.0 million . (Compl. ¶21).  The Company's shares immediately began trading on the American Stock Exchange and within 3 days, Diomed shares rocketed to $9.0 per share – a 450% increase.[1] (Compl. ¶21; Declaration of Laurence Rosen Attached as Ex. A hereto).  The cause of this incredible share price increase was a well-coordinated barrage of stock analyst reports that were secretly bought and paid for by Defendants.[2] (Compl. ¶22). The Complaint alleges that Defendants engaged in a calculated scheme to inflate the price of Diomed stock by paying over $800,000 to Verus and Arkoosh in the merger, who then secretly funneled the money to stock analysts in return for issuing unmitigated BUY recommendations to investors. (Compl. ¶¶23-28).

Diomed's SEC filings indicate that as part of the merger it paid a Verus affiliate $750,000 as an "advisory" fee.  Verus also received a "financial consulting" agreement from Diomed that provided payments of $30,000 per month.  In addition, as part of the merger, Diomed entered into an employment agreement with Arkoosh that called for the annual payment of $50,000 and 50,000 Diomed shares to be paid directly to Verus – not Arkoosh. (Compl. ¶¶31-32).  The Complaint alleges that Defendants clandestinely directed these funds to a network of stock promoters that masqueraded

---

[1] A chart of Diomed's trading history during the Class Period is attached hereto as Exhibit A to Declaration of Laurence Rosen. The Court may take judicial notice of an issuer's stock price data on a motion to dismiss. *In re NAHC, Inc. Securities Litigation,* 306 F.3d 1314, 1331 (3d Cir. 2002).

[2] A search of the publicly available news archives will demonstrate that no news or press releases about Diomed occurred in that two day period that could possibly explain the dramatic price increase as being caused by anything other than the stock analyst reports. According to Bloomberg news, the first news release after the stock began trading on the AMEX was on February 27, 2002.

as unbiased stock research analysts for the illegal purpose of manipulating the market price of Diomed stock. (Compl. ¶¶23, 51).  None of the research reports, nor any of Diomed's SEC filings disclosed this scheme by Diomed to inflate the price of its stock.

The strict pleading requirements of the PSLRA were enacted for the purpose of eliminating so-called strike suits, meritless complaints filed with the hope that the *in terrorem* effect of potential class action damages would force a settlement of an otherwise meritless case. This case is the opposite of a strike suit. Defendants' involvement in the unlawful scheme is quite clear.  The Complaint attaches an article dated March 21, 2002 written by award winning financial journalist Carol S. Remond for Dow Jones, stating Abraham admitted he was approached by Diomed and Catalyst to write his bullish February 2002 report. (Compl. Ex. B, p.3).  In addition, Ms. Remond states that in phone interviews, Bart Walters, the owner of a Florida firm named Catalyst Communications, admitted to having been paid $700,000 by Verus to hire Larry Abraham and produce and distribute over 800,000 copies of Larry Abraham's "Insider Report" to prospective investors. (Compl. ¶ Ex. B, p.3).  Catalyst Communications' co-owner Patrick Kephart has been previously charged by the SEC for paying bribes to induce stock-brokers to sell certain securities to their clients.  (*See* Compl., Ex. B, p.3 and SEC Litigation Release attached as Ex. G).  In addition, lead counsel for plaintiffs personally spoke with Carol Remond, who confirmed that each of the statements set forth in her March 21, 2002 Dow Jones news article are true and correct.[3] (Compl. ¶51).  Thus, Plaintiffs' Complaint attaches documentary evidence that very strongly suggests Defendants' guilt.

Defendants assert that their conduct is lawful; that they had no duty to disclose their payments to the stock analysts and that they can not be held liable under the federal securities laws for manipulating Diomed stock, absent an affirmative misrepresentation in an SEC filing or press

---

[3] The Complaint also attaches many of the stock research reports that Defendants paid to have disseminated to investors, including (1) Larry Abraham's "Insider Report", (2) the SmallCap Digest, and (3) the OTC Journal. (Compl. Ex. A, D, E).

release.  Defendants' view is incorrect.  Having disclosed in Diomed's February 14, 2004 8-K the payment of over $800,000 to Verus for "Financial Advisory" services, Defendants had a duty to disclose fully the purpose of such payments.  Secondly, Rule 10b-5(a) and 10b-5(c) promulgated under §10b of the Exchange Act specifically prohibits the type of market manipulation engineered by Defendants.

For these reasons and for those set forth below, Defendants' motion to dismiss the amended complaint should be denied.

## ARGUMENT

### A.  DEFENDANTS HAD A DUTY TO DISCLOSE THEIR SCHEME TO DIVERT COMPANY FUNDS TO INFLATE DIOMED'S STOCK PRICE.

Defendants assert that they had no duty under federal securities laws to disclose that the financial advisory fees described in the February 14, 2002 Form 8-K that Diomed was paying to Verus were specifically earmarked to finance a clandestine stock manipulation scheme.  In fact, the true purpose of the financial advisory payments was a material fact – as the price of Diomed stock was directly affected by secretly bribing stock analysts to manipulate the stock price.  The case law is rather clear on the issue.  "When a corporation does make a disclosure --- whether it be voluntary or required --- there is a duty to make it complete and accurate. . .  so that what was revealed would not be 'so incomplete as to mislead'." *In re Segue Software, Inc. Sec. Lit.,* 106 F. Supp.2d 161, 167 (D.Mass. 2000)  (quoting *Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996)) (citations omitted).  "A misrepresentation or omission is material and thereby actionable only if a reasonable investor would have viewed it as "having significantly altered the total mix of information made available."" *Basic, Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Gross,* 93 F.3d at 992. An omission is material if "a reasonable investor might have considered [it] important in the making of [the investment] decision." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir.1987) (quotation omitted).

It defies common sense to believe, as Defendants would have it, that an investor considering Abraham's or StockWatch's enthusiastic recommendations to buy Diomed would not consider it material to know that these "impartial" analysts had actually been paid handsomely to issue the BUY recommendations. Had Defendants disclosed that Diomed had paid over $800,000 to hire stock analysts to publish favorable BUY recommendations in an effort to increase the price of the stock, it is hard to imagine that any investor would have purchased Diomed stock at the inflated price.

The Defendants had an affirmative duty to disclose the true purpose of the payments to Verus. (Compl. ¶67). Defendants themselves acknowledge in their moving brief that a duty to disclose arises when an issuer makes "a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." *In re Boston Tech. Sec. Lit..*, 8 F. Supp.2d 43, 53 (D. Mass. 1998) (citations omitted). Having disclosed in its February 14, 2002 Form 8-K that Diomed was paying (1) paying $750,000 to a Verus affiliate as an "Advisory Fee,"(2) $30,000 per month to Verus as part of a financial "consulting" agreement, and (3) $50,000 annually on behalf of Arkoosh's employment agreement, Diomed was obligated to disclose the true intended purpose of the payments. The disclosure of the payments was "incomplete in light of the undisclosed information [that the payments to Verus were being secretly funneled to stock analysts to artificially inflate Diomed stock]." *Id.* (Compl. ¶43). Recently Judge Scheindlin ruled that an illegal market manipulation always gives rise to a duty to disclose:

> This result follows logically from the very purpose of the Exchange Act. In making this determination [of whether there is a duty to disclose] we should bear in mind that a major congressional policy behind the securities laws in general, and the antifraud provisions in particular, is the protection of investors who rely on the completeness and accuracy of information made available to them. Those with greater access to information, or having a special relationship to investors making use of the information, often may have an affirmative duty of disclosure. When making a representation, they are required to ascertain what is material as of the time of the transaction and to disclose fully those material facts about which the [investor] is presumably uninformed and which would, in reasonable anticipation, affect his judgment. … **Moreover, the duty to disclose falls on all parties aware of the manipulation, or who take advantage of it.** … .

*In re Initial Public Offering Sec. Lit.,* 241 F. Supp.2d 281, 382 (S.D.N.Y. 2003) [emphasis

added], *accord*, *U.S. v. Charnay*, 537 F.2d 341, 349-50 (9th Cir. 1976)(duty to disclose

scheme to depress market price under 10b-5); *United States v. Regan,* 937 F.2d 823, 829 (2d

Cir.1991)(affirmative duty to disclose true identity of short seller attempting to depress

market price).

      Defendants assert that Plaintiffs do not allege that the analysts claimed to be free of a conflict

of interest or that they were offering independent analyses about Diomed or its stock.  Defendants

also claim that Larry Abraham fully disclosed that he had received compensation from Diomed for

writing the "Insider Report" and issuing a BUY recommendation.  The Complaint belies Defendants'

assertions.  The Complaint alleges "Due to the improper monetary influences imposed upon these

analysts by Diomed and Arkoosh, the analysts' reports on Diomed could not be deemed fair and

impartial and were in fact misleading and had the effect of manipulating the market price of Diomed

stock.  Defendants' failure to disclose this material fact intentionally and directly misled Plaintiffs

into relying upon the mistaken assumption that the analysts' reports were fair and impartial in

purchasing and retaining Diomed stock … ." (Compl. ¶44).

      Defendants' claim that Abraham adequately disclosed that he was being paid by Diomed to

issue the BUY recommendation is wholly without merit.  The purported disclosure as cited by

Defendants is as follows:

> [t]he distribution of this newsletter report on Diomed to current and potential
> new subscribers was funded at a cost of approximately $700,000.  Catalyst
> Communications received and administered this production budget.  … Larry
> Abraham and his publisher expect to receive new subscriber revenue as a result
> of this mailing, the amount of which is unknown at the time of publication.

This passage does not disclose that Abraham is being paid by Diomed to write the report. It discloses

that Abraham expects "to receive new subscriber revenue as a result of this mailing, the amount of

which is unknown at the time of publication."  The fact that Abraham expects to receive new

subscriber revenue is certainly not a disclosure that he was indirectly paid $700,000 by Diomed to

tout its stock. Moreover, it says that the "distribution" of the report was funded at a cost of $700,000 and that Catalyst Communications "received and administered this production budget." There is no disclosure as to how Catalyst "received' the production budget. Did Abraham and his publisher pay Catalyst to distribute the report? It is not clear. Did Catalyst pay Abraham any of the $700,000? It appears not, as Abraham's compensation is limited to "new subscriber revenue." What is clear is that there is no mention that Diomed paid $700,000 to have Abraham write the report touting Diomed stock. This half-hearted wink and nod to the required disclosure under the securities laws is wholly inadequate to inform investors that this BUY recommendation was bought and paid for by Diomed.

Defendants assert that the fine print notice that Mohammed Patel paid OTC Journal and SmallCap Digest a fee for publishing information on Diomed for one year is sufficient disclosure to investors under the securities laws. This is inadequate for the simple reason that investors are not being told the real source of the funds – Diomed. Investors would attach far more significance to the fact that Diomed was funding the analyst report than an unknown individual named Mohammed Patel, who might have any number of legitimate reasons for doing so. However, when a company and it's largest shareholder embark on a coordinated scheme to pay a group of stock analysts over $800,000 to tout the Company's stock, this becomes a far more significant fact, which is really not comparable to the innocuous disclosure that an individual named Mohammed Patel funded the research.

Section 10(b) of the '34 Act & 17(b) of the '33 Act mandates disclosure (upon penalty of criminal prosecution) when one compensates the publisher of a newsletter for a buy recommendation, with the intention of causing the price of the security to rise. *See U.S. v. Cannistraro*, 800 F. Supp. 30, 81-83 (D.N.J. 1992); *United States v. Eisenberg,* 773 F. Supp. 662, 720 (D.N.J.1991). Defendants' moral compass must be severely off course to posit that it is lawful for the Chairman of a publicly traded company to divert over $800,000 in Company funds to secretly compensate stock market analysts to issue BUY ratings for the Company's stock.

**B.  DEFENDANTS' MISSTATEMENTS AND OMISSIONS VIOLATED THE SECURITIES LAWS**

*(i)  The Complaint Identifies Specific Misstatements and Omissions of Material Fact*

Defendants' contentions that the Complaint fails to allege a false or misleading statement or omission, or why the research reports that Defendants secretly paid for were false or misleading, are patently disingenuous.  "There is no question that plaintiffs have identified the allegedly misleading statements: they are the buy recommendations and price targets contained in the … research reports."  *Fogarazzo v. Lehman Bros., Inc.*  2004 WL 1151542 at * 40 (S.D.N.Y. May 21, 2004) (denying motion to dismiss where the plaintiffs alleged lack of impartiality and conflicts of interest in analysts reports). The facts in this case are even more egregious than in *Fogarazzo* as Diomed and Arkoosh were directing cash to the analysts in return for the BUY recommendations.

Defendants' failure to disclose their scheme to manipulate Diomed stock by paying analysts to issue BUY recommendations is also an actionable omission of material fact by itself.  Defendants ignore numerous cases holding that it is false and misleading to recommend a stock without disclosing a financial interest in the stock or conflicts of interest with respect to the recommendation. Moreover, defendants totally ignore the fact that the Complaint alleges claims under Rule 10b-5(a) and (c), which have no requirement related to misleading statements or omissions  (Compl. ¶¶65, 71).

The failure to disclose manipulative activity is itself a violation of §10(b) and Rule 10b-5 since this failure to disclose "operates as a deceit on the market place and is an omission of a material fact." *U.S. v. Charnay*, 537 F.2d at 351.  "Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." *U.S. v. Regan,* 937 F.2d at 829.  This is equally true, of course, for the failure to disclose that market prices are being artificially inflated, as Judge Scheindlin recently held in the *IPO Sec. Lit.*:

> "Where a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c), that misconduct creates an

independent duty to disclose. Failure to do so thus gives rise to a violation of Rule 10b-5(b). This is so because participants in the securities markets are entitled to presume that all of the actors are behaving legally; silence that conceals illegal activity is therefore intrinsically misleading and (presuming the illegality is also material) is always violative of Rule 10b-5(b)."

*In re Initial Public Offering Sec. Lit.*, 241 F. Supp.2d at 381-82 (citing *United States v. Regan,* 937

F.2d at 829); *U.S. v. Charnay*, 537 F.2d at 351. Indeed, the SEC has emphasized this point:

The manipulator's design ... is to create the appearance that a free market is supplying demand whereas the demand in fact comes from his planned purpose to stimulate buyers' interest. It is of utmost materiality to a buyer under such circumstances to know that he may not assume that the prices he pays were reached in a free market.

*In the Matter of Halsey, Stuart & Co.,* 1949 WL 36458, at *4 (Sept. 21 1949)

In *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir, 1979), the 9th Circuit held that a financial news columnist had a duty under §10(b) to disclose his stock ownership in a company on which he reported favorably. *Zweig* has been followed widely and continues to be good law. *SEC v. Park*, 99 F. Supp.2d. 889, 899 (N.D. Ill. 2000) (10b-5 violation for failing to disclose stock positions in stocks being touted); *SEC v. Blavin,* 557 F. Supp. 1304 (E.D.Mich.1983), *aff'd*, 760 F.2d 706 (6th Cir.1985) (10b-5 violation for failing to disclose positions in stock being touted); *Shivangi v. Dean Witter Reynolds, Inc.*, 107 F.R.D. 313, 319-20 (S.D. Miss. Aug 27, 1985). *Cannistraro*, 800 F. Supp. at 82 (failure to disclose payments to fund analysts amongst other wrongdoing). *Eisenberg*, 773 F. Supp. at 722-24 (D.N.J. 1991)(same). Defendants had an affirmative duty to disclose their market manipulation program, which was being paid for with Diomed funds.

*(ii)  The Analyst Reports were False and Misleading*

In any event, the reports were false and misleading, regardless of whether or not issued in good faith, because the direct payments gave the analyst undisclosed financial motives for making positive recommendations. *SEC v. Capital Gains Research Bureau, Inc.,* 375 U. S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In short, it was false and deceptive to recommend Diomed without disclosing that Diomed was paying for the recommendation. To paraphrase the *Capital Gains*

decision, defendants may have been motivated–consciously or unconsciously–to recommend Diomed stock not because of its investment merits, which would profit investors, but because of the potential for investment banking revenues, which would profit defendants. Defendants' failure to disclose this conflict rendered the research reports false and misleading.  Notably, the U.S. Supreme Court has also held that the conduct is deceptive even if the adviser believed in the recommendation and did not make it for personal profit.[4] It is the practice itself...with its potential for abuse, which 'operates as a fraud or deceit...when relevant information is suppressed.' *Id.* at 200.

"Even if every word of the articles written by [the analyst] were true, [the analyst] would still be in violation of SA § 17(a), SEA § 10(b) and Rule 10b-5 for failing to disclose the paid promotional nature of those articles." *SEC v. Huttoe*, 1998 WL 34078092, at *6 (D.D.C. Sept. 14, 1998) (finding newsletter writer criminally liable for failing to disclose issuer compensation); *accord*, *In re Fidelity/Micron Sec. Lit.*, 964 F. Supp. 539, 547 (D. Mass. 1997) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.")(citations omitted).  Similarly, the court in *Cyber Media Group, Inc. v. Island Mortgage Network, Inc*., 183 F. Supp.2d 559, 573 (E.D.N.Y. 2002), held that it could be a violation of section 10(b) for an analyst to state that a company was a "double your money stock" without disclosing his *specific* and *known* conflict of interest. In the instant case, it was Diomed's clandestine payments to the analysts that operated as a fraud or deceit on the market. While *Capital Gains* was a case under the Investment Advisers Act, the same reasoning was followed in a Section 10(b) case, which rejected similar arguments made by defendants in this case.  In *In re Credit Suisse First Boston Corp. Sec. Lit.,* 1998 WL 734365, at *1 (S.D.N.Y. Oct. 20, 1998) ("*Credit Suisse*"), Credit Suisse issued a

---

[4] Thus, defendants' contention at bar that "plaintiffs do not allege that any defendant believed the ratings to be inappropriate or unsupported" (Def. Memo at 14-15) is irrelevant in light of the systemic corruption of the analysts by Diomed.

stock research report on two companies without disclosing that it had a short position in the stocks. The court rejected the contention that the reports were statements of opinion that are not actionable. *Id.* at *4-5. The court concluded that a reasonable trier of fact could conclude that the failure to disclose Credit Suisse's short positions was a failure to disclose material facts necessary to make the projections not misleading.

There are legions of cases where courts have held that failing to disclose that an analysts' or brokers' BUY recommendation tainted by self-interest or made in bad faith is a material omission of fact violating §10(b). *See Zweig,* 594 F.2d at 1266-67 (failure to disclose ownership of stock recommended in a financial column is §10(b) violation*); Laird v. Integrated Res., Inc.,* 897 F.2d 826 (5th Cir. 1990) (finding valid 10(b) claim stated where adviser failed to disclose commissions received in recommended investments); *Blavin,* 557 F. Supp. 1304 (failure to disclose conflict of interest in investment newsletter was a violation of section 10(b)); *S.E.C. v. Wall Street Pub. Inst., Inc.* 851 F.2d 365, 372 (D.C. Cir. 1988) ("Stock Market Magazine's presentation of articles as objective reporting, if in fact the articles are paid for by the company featured, would be inherently misleading."); *Addeo v. Braver,* 956 F. Supp. 443, 452 (S.D.N.Y. 1997); *Barthe v. Rizzo*, 384 F. Supp. 1063, 1067 (S.D.N.Y. 1974), (plaintiff entitled to know broker in position to gain financially from recommended deal); *Shivangi*, 107 F.R.D. at 318 ; *see also Capital Gains,* 375 U. S. at 196 (Broker may have been consciously or unconsciously motivated by self-interest to recommend the investment); Penny Stock Newsletter, Inc, SEC Investment Advisers Act Rel. No. 946 (Dec 19, 1984), 1985 WL 548700, at *1 (Jan. 3, 1985)(1985) (Penny Stock Newsletter violated securities laws by publishing favorable articles on companies without disclosing it received cash and loans from shareholders or other persons associated with the companies).

In a recent analyst conflict of interest case similar to the case at bar, the court held that analyst reports are actionable where there was a failure to disclose conflicts of interest of the same type that are at issue here. The plaintiffs in that case alleged that analyst reports

> were false and misleading not only because they misrepresented WorldCom's financial condition, but also because they failed to disclose key information regarding the nature and extent of an illicit quid pro quo arrangement that existed between the SSB [analyst] Defendants and WorldCom. Had that self-serving arrangement been adequately disclosed, it would have been apparent that Grubman's [the analyst's] positive reports about WorldCom and recommendations to buy WorldCom were not reliable advice from an independent analyst and trustworthy brokerage house. The illegal quid pro quo arrangement was that the SSB Defendants would issue positive analyst reports about WorldCom, provide WorldCom senior executives with valuable IPO shares, and loan Ebbers hundreds of millions of dollars, in exchange for WorldCom's investment banking business and the substantial revenue and personal compensation that that business generated for the SSB Defendants.

*In re WorldCom Sec. Lit.,* 2003 WL 21219049, at *8 (S.D.N.Y. May 19, 2003). The Court rejected SSB and Grubman's motion to dismiss the count based on Grubman's reports, holding that the complaint stated a claim for failing to disclose the "*quid pro quo* relationship" as well as for other reasons. *Id* at *29. The Court rejected the argument that the analyst reports "were simply statements of opinion and expressions of optimism held in good faith." *Id.* at *31. The Court held that plaintiffs had sufficiently alleged Grubman did not render those opinions in good faith because, among other things, "Grubman was not functioning as an independent analyst, but had been corrupted." *Id.* In the instant case, the allegations of the complaint are sufficient to show that Larry Abraham "was not functioning as an independent analyst," but that he functioned as a partisan promoter of Diomed stock, and that he had been corrupted by the massive payments he secretly received from Diomed.

      *(iii)*      *The Payments from Diomed to the Analysts Entangle Defendants*

      Defendants claim that the Complaint does not specifically allege facts showing that Defendants are "entangled" in the analysts' statements. Firstly, Abraham stated to Carol Remond, the Dow Jones news columnist, that he was approached by Diomed and Catalyst to write the report. (Compl. ¶28, Ex. B). Catalyst Communications (Bart Walters) stated that Verus directly paid Catalyst and that Catalyst then paid over $700,000 to compensate Abraham and disseminate the analysts' reports. (Compl ¶¶28, 33, 38-40; Ex. B – C, F). The reports themselves are attached to the Complaint as Ex. A, D, E. In addition, the Feb. 14, 2002, Form 8-K irrefutably demonstrates that

approximately $822,500 was paid by Diomed to Verus (Arkoosh's firm) for "financial consulting" as of March 15, 2002.[5] (Compl. ¶¶31-32)  This amount  approximates the $875,000 that Stockwatch states was paid to Catalyst Communications (Compl. ¶¶38-9) of which Catalyst paid $700,000 for Abraham's report, $50,000 to OTC Journal[6], $100,000 to SmallCap Digest, and an unknown amount to StockWatch. (Compl. ¶¶35-39, 51).

The Dow Jones article states: "But Abraham told Dow Jones Newswires that he was approached by Diomed and by Catalyst to write his bullish February report on the company.   In phone interviews, Catalysts owner Bart Walters said that a total of $700,000 was spent to hire Larry Abraham, print and produce 800,000 copies of the report and send them out to prospective investors. He said that his firm was paid directly by Verus International … ." (Compl. Ex. B). According to the March 20, 2002 Vancouver Sun article, the StockWatch analyst report states that Stockwatch was paid by Catalyst Communications, which in turn had been given a "marketing budget" of $875,000 and options to buy 350,000 Diomed shares from an "unidentified third-party group with interest in Diomed" to promote the stock. (Compl. Ex. F).  "Upon information and belief, this so-called "unidentified third-party group" cited as the sponsor of the Stockwatch newsletter tout refers to none other than Verus and Arkoosh, based on the fact that Catalyst's owner Bart Walters had said in the Dow Jones article mentioned above that his firm was paid directly by Verus for purposes of promoting Diomed stock." (Compl. ¶39)  Again, this amount ($875,000) closely matches the $750,000 Verus received from Diomed as an "advisory fee" in the merger, plus the $30,000 per month Verus received as a consulting fee and the $50,000 salary for Arkoosh. (Compl. ¶¶29, 31).

---

[5] Diomed paid Verus a $750,000 advisory fee on Feb. 14, 2002, plus $30,000 per month for "financial advisory services," plus $50,000 (paid quarterly) for Arkoosh, which was also paid to Verus.  If the $30,000 monthly contract began on Feb. 14, 2002, than by March 15, 2002, Diomed would have paid Verus approximately $822,500. Since Diomed was committed to paying $30,000 per month to Verus, any shortfall would be quickly compensated for.
[6] While OTC Journal and SmallCap Digest state they were each paid $50,000 by Mohammed Patel, the Complaint alleges that the funds originated from Diomed and Arkoosh. (Compl. ¶41).

This is extremely detailed and convincing evidence that Diomed and Arkoosh funneled $875,000 to Catalyst to direct payments to Abraham, Stockwatch and other analysts to issue BUY recommendations for Diomed stock. More importantly though, these clandestine payments from Diomed create a powerful entanglement between Diomed and the analysts. Entanglement may be proven "'by the issuer having either 'fostered,' 'induced,' or otherwise caused the statement to be made in the first place'" *In re Allaire Corp. Sec. Lit.*, 224 F. Supp.2d 319, 339 (D. Mass., 2002) (quoting *Boston Tech.,* 8 F. Supp.2d at 54). What stronger form of entanglement is possible other than an $875,000 payment in return for a BUY recommendation? These substantial payments are precisely what the First Circuit had in mind when it established the "entanglement" test.

### C.    PLAINTIFFS ARE NOT REQUIRED TO PLEAD A FALSE OR MISLEADING STATEMENT TO STATE A CLAIM UNDER RULE 10B-5(A) OR (C)

In Count I of the Complaint, Plaintiffs allege that defendants violated Rule 10b-5(a) and (c), as well as Rule 10b-5(b). (Compl. ¶71). Defendants have inexplicably ignored those claims and the recent decision in this district holding that claims under Rules 10b-5(a) and (c) do not require false or misleading statements. *Swack v. Credit Suisse First Boston*, 2004 WL 2203482, at*9-10 (D. Mass. Sept. 21, 2004) ("The conduct necessary to form a Rule 10b-5(a) or (c) violation can vary widely, but presumably these sections are intended to cover different conduct than Rule 10b-5(b)").

Rule 10b-5(a) and (c) make it unlawful for any person, directly or indirectly "(a) to employ any device, scheme, or artifice to defraud," or "(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240. 10b-5. Those provisions do not require a material misstatement or omission:

> While subsection (b) of Rule 10b-5 provides a cause of action based on the "making of an untrue statement of a material fact and the omission to state a material fact," subsections (a) and (c) "are not so restricted" and allow suit against defendants who, with scienter, participated in "a 'course of business' or a

'device, scheme or artifice' that operated as a fraud" on sellers or purchasers of
stock even if these defendants did not make a materially
false or misleading statement or omission.

*In re Enron Corp. Sec. Derivative and ERISA Lit..,* 235 F. Supp.2d 549, 577 (S.D. Tex. 2002)(citing

*Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152-153, 92 S.Ct. 1456, 31 L.Ed.2d 741

(1972)). Several forms of conduct in addition to misleading statements or omissions are prohibited by

Rule 10b-5 (a) and (c).

> Market manipulation, employment of a manipulative device, and engaging in
> manipulative schemes such as a scheme to artificially inflate or deflate stock
> prices, falsifying records to reflect non-existent profits, and *creating and
> distributing false research reports favorably reviewing a company* are other types
> of conduct prohibited by §10(b) and Rule 10b-5 that do not fall within the
> category of misleading statements and omissions.

*Enron,* 235 F. Supp.2d at 579 (emphasis added).[7]

It is well settled that to state a claim under Rule 10b-5(a) or (c), plaintiffs must allege only

that "(1) they were injured; (2) in connection with the purchase or sale or securities; (3) by relying on

a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative

conduct; and (5) the defendants were engaged in the manipulative conduct with scienter." *Swack,*

2004 WL 2203482, at*9; *In re IPO Sec. Lit.,* 241 F. Supp. 2d at 385 (quoting *In re Blech Sec. Lit..,*

961 F. Supp. 569, 582 (S.D.N.Y. 1997)); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct.

1375, 47 L.Ed.2d 668 (1976); *In re Sterling Foster & Co., Inc. Sec. Lit..,* 222 F. Supp.2d 289, 303-04

(E.D.N.Y. 2002).  Thus, contrary to defendants' contentions, plaintiff is not required to plead any

particular false or misleading statements when alleging that defendants were engaged in a deceptive

scheme covered by Rule 10b-5(a) or (c).  *See IPO Sec. Lit.,* 241 F. Supp. 2d at 385.  Indeed, as Judge

Pollack, the author of the Merrill Lynch decisions cited by defendants, has recently stated, "[s]tock

---

[7] *See also SEC v. Zandford,* 535 U.S. 813, 814, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) ("Neither the SEC nor this
Court has ever held that there must be a misrepresentation about a particular security's value in order to run afoul of
the Act."); *Superintendent of INS v. Bankers Life & Cas. Co.,* 404 U.S. 6, 11 n.7, 92 S.Ct. 165, 30 L.Ed.2d 128
(1971) ("We believe that § 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or
sale of securities, whether the artifices employed involved a garden variety of fraud or present a unique form of
deception.").

market manipulation is any 'intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *SEC v. Martino*, 255 F. Supp.2d 268, 286 (S.D.N.Y. 2003) (Pollack, J.) (quoting *Hochfelder*, 425 U.S. at 199 . "Sufficient proof of manipulation exists if the manipulator caused either actual or apparent activity or caused a rise in the market price." *Id.* (quoting *SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964, 976 (S.D.N.Y. 1973)).

Here, the Complaint alleges a broad scheme by Diomed and Arkoosh to divert more than $800,000 of Diomed funds to secretly pay a group of stock analysts to issue BUY recommendations for Diomed stock.  (Compl. ¶¶ 23-45).  This is exactly the type of fraudulent conduct that the courts in *Swack* and *Enron* held would support a claim under Rule 10b-5(a) & (c). *See Swack*, 2004 WL 2203482, at *26; *Enron,* 235 F. Supp. 2d at 579 ("creating and distributing false research reports favorably reviewing a company are other types of conduct prohibited by §10(b)").

### D.  THE GENERIC CAUTIONARY LANGUAGE IN THE ANALYSTS' REPORTS DOES NOT SHIELD DEFENDANTS FROM LIABILITY

Defendants also contend that each report adequately disclosed the alleged conflicts of interest because they contained a legend, standard in all research reports, regarding possible conflicts.[8] Def. Memo at 19.  However, under the law in the First Circuit, the "cautionary language" in the reports must be sufficiently strong in tone to counter the effects of the misleading analysts' reports. *In re Boston Tech. Inc.,* 8 F. Supp.2d at 53.  That simply was not the case here.

Defendants point to such anemic disclosures as: (a) "all statements and expressions are the sole opinions of the editors and are subject to change without notice."  (b) "Investing in securities carries a high degree of risk and readers of this newsletter are strongly urged to review all information relative to the company discussed at the company's website www.diomedinc.com." (c) "All factual information in this report was gathered from sources believed to be reliable but Insider

---

[8]  Defendants also claim that their misstatements and omissions of material fact are protected as "forward looking statements." Def. Memo p. 18. However, Defendants do not and cannot point to any forward looking statements that are alleged in the Complaint to have been false or misleading. Thus, this line of argument is completely irrelevant to the issues at bar.

Report can make no guarantee as to its accuracy or completeness, it should be considered advertising and for informational purposes only."

However, none of the above statements disclose that Diomed had paid $700,000 to Abraham to issue the buy recommendation for Diomed stock. None of the statements disclose that Diomed and its chairman are using Company funds to engage in a scheme to manipulate the stock price by paying analysts to issue buy recommendations.

In fact, this identical contention was rejected in *Credit Suisse*, in *Swack* and in every other analyst-related case:

> In addition, the defendants are not shielded from liability by the general disclosure they placed at the bottom of every page of the Trading Notes....if a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability....

*Credit Suisse,* 1998 WL 734365, at *7. Boilerplate disclosures of potential conflicts of interest do not suffice as a matter of law where one knows of an actual more specific conflict. *Swack,* 2004 WL 2203482, at*9 (*citing, La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 850-51 (11th Cir.2004) ("disclosures are too general and ambiguous to provide a warning of the fraud alleged in the complaint. … that the ratings, recommendations, and target prices in the reports were not based on [the analyst's] unbiased real opinions, but were instead deliberate attempts to inflate the stock price)); *In re WorldCom, Inc. Sec. Lit..,* 294 F. Supp.2d 392, 429-30 (S.D.N.Y. 2003) ("boilerplate disclosure in analyst reports that analyst's firm 'may from time to time perform investment banking or other services for, or solicit investment banking or other business from, any company mentioned in this report' did not, for purposes of motion to dismiss, provide notice to the public of analyst's conflict of interest").

In *SEC v. Huttoe,* 1998 WL 34078092, at *1 (D.D.C. Sept. 14, 1998) the court held that as a matter of law the following cautionary language at the bottom of an investment newsletter – almost identical to that cited by Defendants - was insufficient:

SGA Goldstar Research is not an investment advisor! Information contained in SGA Goldstar is obtained from sources believed to be reliable; however, in certain instances such information involves rumors or other time sensitive materials which cannot adequately be verified. SGA makes no representation or warranty as to the accuracy or adequacy of the information and recommendations provided. This material is not deemed as a solicitation for the purchase or sale of a security or commodity. Use of the information and recommendations is at the subscriber's sole risk. Personnel associated with SGA may own shares in the companies mentioned herein or may act as consultants thereto for compensation. Prudent investors are advised to use mental stop losses to protect their gains or limit their losses. All stocks priced under $5 per share are deemed "penny stocks" and are extremely risky and speculative!

*Huttoe* 1998 WL 34078092, at *5.

It is ridiculous to believe that such warnings as "investing in securities carries a high degree of risk" and "all statements and expressions are the sole opinions of the editors" serve to temper such incredibly bullish analyst statements as: "this is a company that has everything you could possibly want right now" and "so let me repeat: Buy Diomed (DIO: Amex) and do it now." (Compl. Ex. A, p. 6). The boilerplate cautionary language was meaningless next to such strong positive statements.

Moreover, the Larry Abraham "Insider Report" was a subscription based analyst newsletter. (Compl. Ex. B p.2). This meant that investors were paying Abraham for what they believed was unbiased impartial research. (Compl. ¶44, Ex. A. p.2) No rational investor would pay for and read investment research that they knew to be simply a paid advertisement of no analytical value.

The cautionary language was insufficient as a matter of law to warn investors of Defendants unlawful scheme to manipulate the market price of Diomed stock, which defendants have an independent duty to disclose. *In re IPO Sec. Lit.*, 241 F. Supp.2d at 381-82. In any event, "[w]hether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." *In re Segue Software,* 106 F. Supp.2d at 167 (citing *Fecht v. The Price Co.,* 70 F.3d 1078, 1081 (9th Cir.1995)).

### E.  THE COMPLAINT ADEQUATELY PLEADS SCIENTER

Defendants' argument that the Complaint does not plead scienter is essentially a rehash of

their contention that the Complaint does not plead a false statement or omission. *See* Def. Memo at 20. But if, as plaintiff demonstrated in the preceding sections, the Complaint alleges a scheme, a material misstatement or omission, or a fraudulent course of business, then clearly there is a strong inference of scienter.

"Scienter" describes a mental state "embracing intent to deceive, *manipulate* or defraud." *In re Segue Software,* 106 F. Supp.2d at 166 (citing *Hochfelder,* 425 U.S. at 193 n.12). Scienter may be established by allegations of knowing or reckless conduct. *See In re Cabletron Sys., Inc.,* 311 F.3d 11, 38-40 (1st Cir. 2002).[9] In evaluating such allegations, the "scienter must be reasonable and strong, but need not be irrefutable." *Id.*; *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002). A plaintiff must show only that "his characterization of the events and circumstances as showing scienter is highly likely." *Aldridge,* 284 F.3d at 82. The First Circuit has held that scienter may be established by indirect and circumstantial evidence and has "rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case." *In re Cabletron*, 311 F.3d at 39. Allegations based on information and belief can support a strong inference of scienter so long as the "source of the information and the reasons for the belief" are set forth in the Complaint. *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991); *Crowell v. Ionic*s, 2004 WL 2475332, at *11 (D.Mass. Nov. 3, 2004).

Diomed's fraudulent scheme, and Arkoosh's participation in it, was done knowingly and intentionally, or at a minimum with reckless disregard for the potential to mislead investors. Diomed diverted over $800,000 to Verus which was then paid to Catalyst Communications to compensate the stock analysts. (Compl. ¶¶23, 31-32, 39, 42, 51). The payments to Verus, Catalyst, Abraham and others; the analyst's favorable coverage of Diomed, and the failure to disclose the direct substantial

---

[9] Recklessness is "defined as a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 13 (D. Mass 2000) (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999) (other citations omitted).

monetary payments in return for BUY recommendations, were hardly inadvertent. *Cf. Aldridge*, 284 F.3d at 83. The Defendants' scheme to purchase BUY recommendations and high price targets in exchange for cash was a conscious, deliberate business strategy. Conscious wrongdoing is sufficient to establish the required inference of scienter. *In re Cabletron Systems, Inc.,* 311 F.3d at 39.

Engaging in deliberately illegal behavior creates an inference that defendants acted with the required scienter. *In re IPO Sec. Lit.,* 241 F. Supp.2d at 385 & fn 161 (tie-in arrangements do not happen accidentally or negligently). The Complaint alleges that the secret payments to stock analysts were also a clear violation of §17(b) of the Securities Act of 1933, which makes it unlawful to publish information about a security for consideration received from an issuer, underwriter or dealer, without fully disclosing such consideration. (Compl. ¶49). While there is no private cause of action under §17(b), the SEC can bring an enforcement action and the US Attorney may criminally prosecute such violations. *See Huttoe*, 1998 WL 34078092, at *6. Defendants can be held liable under §17(b) and §10(b) as primary violators for intentionally paying the analysts through third-party shills in an attempt to manipulate the price of Diomed stock.[10] *See U.S. v. O'Hagen,* 521 U.S. 642, 664, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (primary liability for use of manipulative device). This is not "bootstrapping." On the contrary, knowingly violating §17(b) by secretly paying an analyst to provide favorable coverage is sufficient evidence of scienter under §10(b).[11] Clearly, Diomed intended to evade compliance with §17(b) by using Verus and Catalyst Communications as conduits for the illicit payments to the analysts. "Market manipulation" is that conduct which runs afoul of the "fundamental objectives of the securities laws." *In re IPO Sec. Lit.,* 241 F. Supp.2d at 385; *Sullivan*

---

[10] *See also In The Matter of Dickinson & Co. and T. Marshall Swartwood*, 1997 WL 680587, at *1 (Nov. 4, 1997). In that case, the SEC held the president of an issuer liable as an aider and abettor under §17(b) for paying an analyst through its "investor relations firm" to write a research report on the issuer which was then published by a broker/dealer. The facts are almost identical to what Diomed and Arkoosh have done.

[11] The same misconduct can support a violation of §10(b) of the 34 Act and §17(a) and §17(b) of the 33 Act. *Huttoe*, 1998 WL 34078092 at *6.

*& Long, Inc. v. Scattered Corp.,* 47 F.3d 857, 865 (7th Cir.1995) (Posner, C.J.). *See also Blech,* 961 F. Supp. at 580.

The complaint alleges specific admissions by Abraham and Catalyst that they were approached and paid by Diomed and Verus to write the favorable analyst reports. (Compl. ¶¶ 33, 38, 51; Ex. B, p.3). Moreover, the Complaint attaches the news articles which capture the admissions regarding Defendants.(Compl. Ex. B, C, F). Lead counsel for Plaintiffs contacted the Dow Jones reporter, Carol Remond and confirmed the truth of the facts set forth in the article.[12] (Compl. ¶51).

Allegations, such as those in the Complaint, that the analysts have been intentionally corrupted demonstrate strong circumstantial evidence of conscious misbehavior. *See Fogarazzo*, 2004 WL 1151542, at *45. In *Huttoe* the court held that the SEC demonstrated sufficient scienter by showing that defendant newsletter writer had knowingly "received stock in return for promoting the issuer of the stock and that he knew that the 'disclaimer' appearing in the Newsletter did not state that the staff received stock in return for promoting the issuer in the Newsletter. The ineffectiveness of the Newsletter's disclosure was not merely negligent. These statements were so likely to mislead subscribers that it was "either known to the defendant or [was] so obvious that the actor must have been aware of it." *Huttoe*, 1998 WL 34078092 at *6 ("Clearly [defendant] must have known that the footnote in the Newsletter could not have adequately alerted subscribers to the fact that he and [co-defendant] received free stock for promoting the companies they urged subscribers of the Newsletter to buy.") (citing *SEC v. Steadman,* 967 F.2d 636, 641-42 (D.C.Cir. 1992). The same is true of Arkoosh, a CPA and corporate lawyer. (Compl. ¶50). He knew that, by funneling the payments to Abraham and Catalyst through Verus, the true source of the analysts' compensation would not be disclosed and that investors would be deceived in violation of §10(b) and §17(b). (Compl. ¶43).

---

[12] Defendants suggest that this allegation is insufficient evidence that the Dow Jones article is truthful and suggest only an affidavit will suffice, however, attaching an affidavit to a complaint is improper. *In re Empyrean Biosciences, Inc. Sec. Lit.*, 219 F.R.D. 408 (N.D. Ohio 2003). It would also be improper for the plaintiffs to swear to those allegations in the Complaint which are made based in great part on their counsel's investigation.

Why else channel the money to Abraham in such a circuitous fashion?  Moreover, why other than for illicit motives did Arkoosh choose to use Catalyst Communications as the "bag man" to funnel the payments to Abraham and StockWatch?  A simple Lexis/Nexis or Westlaw search discloses that Catalyst's principal, Patrick Kephart was the subject of an SEC enforcement action for bribing stockbrokers to sell certain securities to their clients. (Compl. ¶52, Ex. G).  Perhaps that was the attraction of using Catalyst as the go-between.

Contrary to Defendants' assertion, the Abraham report dated February 2002 was used to create a strong demand for Diomed's $10.0 million private placement on Feb. 14, 2002 evidencing Defendants' scienter. See, *In re Resources America Sec. Litig.*, 2000 U.S. Dist. LEXIS 10640 *6 (E.D. Pa. July 26, 2000) (holding that artificially inflating stock price of a company to complete offering on desired terms is sufficient to plead scienter).  Defendants claim that the report was written after the stock began trading on Amex.  Contrary to Defendants' assertion, the Abraham report does not state that Diomed shares are already trading on the Amex it states "Diomed has just begun offering its shares to the public on the American Stock Exchange." (Compl. Ex. A 6). This sentence can easily be read to mean that Diomed is undertaking an offering (the $10 million private placement) of its shares, which are set to begin trading on the Amex.  This is in fact the most reasonable interpretation.[13]  Secondly, what monthly financial magazine or newsletter hits the newsstands or is distributed after the fourteenth of the month? The court can take judicial notice of the fact that the practice in the publishing industry is to post-date publications, not pre-date them. Would an investor pay $199 per year for a stale "February" financial newsletter that gets distributed weeks after its publication date?  It would take at least one week to print and mail 800,000 copies of the report to investors. No publisher would distribute a "February" financial newsletter in the last week of February rendering it obsolete upon publication. Thirdly, the report states "I think Diomed in

---

[13] The report also contains the acronym "(DIO: AMEX)" without any explanation (Compl. Ex. p.1).  This does not mean the stock was already actively trading on the Amex at the time of writing as Abraham could easily have been aware of the planned Amex listing long before it actually happened.

its current reality would easily justify a price between $8.0 and $10.0 per share just based on comparables." (Compl. Ex. A, p. 6). This must have been written prior to the date of the private placement because Diomed was trading at almost $8.0 per share by Feb. 19, 2002, only three trading days after the Feb. 14, 2002 private placement (Compl. ¶21; Rosen Decl. Ex. A). If the stock was already trading at $8.0 per share at the time Abraham wrote the report, he would not have predicted an $8.0-$10.0 price target. Thus the report must have been written when the stock was trading under $2.00 – prior to the private placement date. Lastly, the report mysteriously does not include any current stock price data for Diomed, which is highly unusual. This indicates that Abraham wrote the report prior to the Amex listing and did not include any current price data to avoid having the information be considered stale. These facts demonstrate that the 800,000 copies of the Abraham report were distributed prior to Feb. 14, 2002 and helped create demand for the private placement, which raised $10.0 million for Diomed. (Compl. Ex. B, p.3).

Defendants correctly point out that the Complaint nowhere alleges that Arkoosh sold any stock during the Class Period. Defs.' Mem. at 21. "The submitted filings do not, however, conclusively establish that [defendant] engaged in no stock trading during the Class Period. Thus, the best the … Defendants can say at the motion to dismiss stage is that there is no allegation that any of them profited from stock trading during the Class Period." *Crowell,* 2004 WL 2475332, at *13 (Young, CJ); "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. V. America West Airlines,* 320 F.3d 920, 62 (9th Cir. 2003), citing, *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 507 (9th Cir. 1992); *[citations omitted).* Even if Arkoosh did not profit from stock trades during the Class Period, this "does not establish that he lacked any motive to mislead the investing public, and a recklessness argument by definition would not require a motive in any event." *Id.* at *13. In *Crowell*, Chief Judge Young posited several persuasive reasons why the absence of evidence of stock trading does not preclude a motive for the fraud.

(1) "[T]he absence of stock trading profit does not establish the absence of a scheme to profit through insider trading. It only establishes the absence of a successful scheme."

(2) "The …Defendants could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell, such that by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability."

(3) The alleged fraudulent scheme could well produce numerous benefits for each of the Defendants including an increased stock price.

*Crowell,* 2004 WL 2475332, at *14. At the time the manipulation scheme was carried out, Arkoosh owned 131,000 shares of Diomed stock. In addition, he served as COO and CFO of Verus which owned 15.2% of Diomed's stock. (Compl.¶18). Verus was receiving $30,000 per month as a financial consulting fee ($15,000 cash and $15,000 in expenses). (Compl. ¶31) In addition, Arkoosh received $50,000 and 50,000 Diomed shares annually for serving as Chairman (though his compensation was paid directly to Verus). (Compl. ¶32). These payments were specifically directed to support Defendants' manipulative scheme. (Compl. ¶¶33, 38, 39, 42, 51). Arkoosh's *motive* to profit Verus and himself from an increase in the stock price is clear. That the scheme was uncovered within weeks by the Post and Dow Jones – preventing Arkoosh and Verus from reaping the profits is only a testament to their bad luck, not their innocence. *Crowell,* 2004 WL 2475332, at *14. Moreover, one wonders why Arkoosh's compensation as Chairman was paid directly to Verus. Certainly there is a tangled web of interests amongst Verus, Arkoosh and Diomed that is opaque to outside observers.

Defendants attempt to discredit the Complaint's more peripheral allegations of scienter in a piecemeal fashion, but scienter is determined by the <u>totality</u> of the circumstances. *In re Cabletron*, 311 F.3d at 39 ("'The plaintiff may combine various facts and circumstances indicating fraudulent intent' – including those demonstrating motive and opportunity – to satisfy the scienter requirement.")

(quoting *Aldridge*, 284 F.3d at 82.); *Crowell*, 2004 WL 2475332, at \*11.  When one examines all of the facts comprising the manipulative scheme, a troubling image of intentional wrongdoing emerges. Diomed admits it has paid over $800,000 to Verus for "financial advisory services." (Compl. ¶¶31-32). Abraham admits that he was approached by Diomed and Catalyst to write his glowing report. (Compl. ¶28, Ex. Bp.3). Catalyst principal Bart Walters admitted he was paid directly by Verus and spent $700,000 to hire Larry Abraham, print and distribute 800,000 copies of the Abraham's report. (Compl. ¶28, Ex. B, p.3). The StockWatch report states it was paid by Catalyst who had received an $875,500 "marketing budget" to promote Diomed stock. (Compl. ¶38, Ex. F. p.3).  A Catalyst principal (Patrick Kephart) has previously been censured by the SEC for bribing stockbrokers to recommend particular stocks to clients. (Compl. ¶52, Ex. G).  Neither the StockWatch nor the Larry Abraham report disclosed that Diomed had paid them to publish the stock recommendations. Compl. ¶¶23, Ex. A, F).  At least two other newsletters (SmallCap Digest and OTC Journal) touted Diomed stock in February and March 2002. (Compl. ¶¶35-36, Ex. D, E). Both claimed to be paid by an individual named Mohammed Patel. (Compl. ¶¶35-36).  Arkoosh admits that he may have met Patel "casually once or twice". (Compl. ¶37, Ex. C, p.3).  Arkoosh is a CPA and corporate lawyer who is presumed to know that the securities laws mandate disclosure where an issuer pays an analyst to promote its stock. (Compl.¶50, §17(b) of the Act).  Verus, for whom Arkoosh serves as CFO and COO, has a history of engineering reverse mergers which immediately result in a stock price run-up and a subsequent crash. (Compl. ¶55, Ex. H-I). Diomed's stock price went up by a factor of 450% during February and early March 2002.  There was absolutely no other material news released about Diomed during this time period –only the analysts' reports. (Compl. ¶¶21-22).  The only reasonable inference that can be drawn from these facts is that Arkoosh and Diomed intentionally funneled the payments to the analysts through Verus and Catalyst in an attempt to manipulate the price of Diomed shares and violate the securities laws.

### F.  THE COMPLAINT ADEQUATELY PLEADS RELIANCE

(i) *The Complaint Alleges Solely Omissions of Fact Allowing a Presumption of Reliance*

The *Affiliated Ute* presumption applies to securities fraud cases that allege primarily omissions of material fact, and holds that reliance is presumed in such cases.  *See Affiliated Ute,* 406 U.S. at 153-54; *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) (recognizing that "*Affiliated Ute* presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible"); *Margaret Hall Found., Inc. v. Atlantic Fin. Mgmt., Inc.*1987 WL 15884, at *4 (D.Mass. July 30, 1987)(certifying class action in omissions case).  One cannot rely on something one has neither read nor heard so the assumption is that "the plaintiff is generally incapable of proving that he relied on a material [nondisclosure]." *Newton v. Merrill Lynch*, 259 F.3d 154, 174 (3d Cir. 2001) (quoting *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir. 1981)).[14] There is no doubt that this case primarily, in fact only, alleges omissions of material fact, making the *Affiliated Ute* presumption particularly appropriate – the singular omitted fact being that Diomed had diverted over $800,000 to pay analysts to issue BUY recommendations in an effort to manipulate the price of the stock. *Affiliated Ute,* 406 U.S. at 153.

(ii) *The "Fraud on the Market" Presumption of Reliance is Appropriate*

Class members are also entitled to a presumption of reliance because Defendants created a "fraud on the market." *Basic v. Levinson,* 485 U.S. at 241.  The Complaint, at ¶¶59-60, properly alleges each of the five factors required to show an efficient market under *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 n. 17 (D.N.J. 1989); *followed by*, *In re PolyMedica Corp. Sec. Lit.*, 224 F.R.D. 27,

---

[14] In  *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir. 1981), reliance was presumed in an action filed by investors in a limited partnership against  the accountants who prepared  an opinion letter which omitted material facts about the limited partnership.  The accounting firm was given the burden of proving non-reliance at trial. Sharp, 649 F.2d at  (relying on *Affiliated Ute*, 406 U.S. at 153-154  and *Huddelston v. Herman & McLean*, 640 F.2d 534 (5th Cir. 1981)); *see also Newton v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 259 F.3d 154, 174-175, 177 (3d Cir. 2000) (stating that the seminal decision on presumption of reliance is *Affiliated Ute* and holding that class of stockholders were entitled to presumption of reliance in case where defendants failed to disclose material facts).

42 (D. Mass. 2004). Defendants do not dispute that these five factors are adequately plead.

Defendants assert, however, that if plaintiffs relied on anyone, they relied on the analysts – not

defendants. Defendants ignore the crux of the fraud on the market theory of reliance: By paying the

analysts for the BUY recommendations, without disclosing such payments, Defendants have

committed a fraud on the market and plaintiffs need neither plead nor prove that they ever read the

analysts' reports. *See DeMarco v. Robertson Stephens Inc.*, 318 F. Supp.2d 110, 119 (S.D.N.Y.

2004). "Research analysts who study publicly traded companies and make recommendations on the

securities of those companies exert considerable influence in the marketplace. The reports and/or

recommendations of such analysts can influence the price of a company's stock even when nothing

about the company's prospects or fundamentals have changed." *La Grasta,* 358 F.3d at 842. The

Complaint clearly alleges that Diomed's stock price was artificially inflated as a result of the

misconduct. (Compl. ¶¶21, 45, 62).

In this instance, plaintiffs face a motion to dismiss under FRCP 12(b)(6) and the required

factual showing is much less stringent than in *Cammer or Polymedica. See, Semerenko v. Cendant

Corp.,* 223 F.3d 165, 179 (3d Cir. 2000)(Pleading five *Cammer* factors, without more, is sufficient to

withstand motion to dismiss). The Complaint as pled more than adequately meets each element for

the Plaintiffs' presumption of reliance to withstand a motion under FRCP 12(b)(6). *See* Compl. ¶¶59-

61; *In re USA Talks.com, Inc. Sec. Lit.*, 2000 U.S. Dist. LEXIS 14823, at *15-16 (S.D. Cal. Sept. 14,

2000) ("A showing of whether the *Crammer* elements are met requires a factual exploration which is

premature at the motion to dismiss stage. Moreover, the applicable pleading standards for a fraud-on-

the-market theory have not been heightened by the PSLRA").

  (iii)  *Plaintiffs Have Already Demonstrated the Omissions were Material and
      Defendants' had a Duty to Disclose the Illicit Payments*

Evidencing the tenuousness of Defendants' motion to dismiss, Defendants assert that these

two presumptions of reliance are inapplicable to this case because Defendants' had no duty to

disclose their payments to the stock analysts or the manipulative scheme. Plaintiffs have already demonstrated above that Defendants had an affirmative duty to disclose the illicit payments and the manipulative scheme. (*See* Section A above).

Defendants also assert that the payments to the analysts were not material. Plaintiffs have demonstrated above that every court to address the issue has held that an analyst's receipt of consideration from a company on which he is reporting is a material fact that must be disclosed.[15] (*See* Section B above). In fact §17(b) of the Securities Act makes it a crime not to disclose such material information. Moreover, Plaintiffs have also demonstrated above that engaging in a manipulative scheme to inflate a company's stock price is a material fact warranting disclosure.

*(iv) The Timing of Plaintiffs' Purchases Does not Demonstrate Non-Reliance*

Defendants also assert that the Complaint must be dismissed as to those plaintiffs that purchased any shares after publication of the March 11, 2002 New York Post article because they knew of the manipulative scheme and could not have relied on its non-disclosure. This argument fails for several reasons: (1) Each of the plaintiffs allege that they purchased their shares without knowledge of the material adverse information and in reliance on the integrity of the market. (Compl. ¶¶59(c), 68); (2) the March 11, 2002 article was printed in the New York Post, which is essentially a local newspaper, not readily available anywhere outside Metropolitan New York, so knowledge of the article cannot be imputed to plaintiffs;[16] (3) the New York Post article was not a corrective disclosure as it did not reveal that Diomed had paid for the analysts' reports. It only disclosed that Arkoosh may have met an individual named Mohammed Patel who had paid to publish two of the reports; (4) Whether the March 11, 2001 article served as a corrective disclosure and whether

---

[15] Plaintiffs demonstrated that the Feb. 14, 2002 8-K was materially misleading in that it disclosed Diomed was making the $875,000 in payments to Verus for "financial advisory services", without disclosing that the funds would be used to pay analysts to issue BUY recommendations as part of a manipulative scheme.

[16] Lead Plaintiffs Marsh and Buck purchased shares on March 11, 2002. It is unlikely that the New York Post article was even available in Pensacola, Florida and West Bend, WI the morning of March 11, 2002 when they purchased their shares. Moreover, whether the plaintiffs placed a market or limit order to purchase the stock prior to March 11th and the order was not filled until that date are fact questions that must be reserved for a later date.

plaintiffs' allegations that they were not aware of the fraud at the time of their purchases are true is an inherently fact specific inquiry and not appropriate to decide on a motion to dismiss. *Schaffer v. Timberland Co.,* 924 F. Supp. 1298, 1309 (D.N.H. 1996) ("truth on the market defense presented by the defendants necessarily involves a fact-intensive inquiry which is ill-suited to a motion to dismiss."); In *re Biogen Sec. Lit.,* 179 F.R.D. 25, 36 (D.Mass. 1997) (citing *In re Taxable Mun. Bonds Lit.,* 1994 WL 532079, at *3 (E.D.La. Sept. 26, 1994) which notes that determination of truth on market defense is "fact intensive and, therefore, the defendants have an onerous burden on summary judgment ."); *DeMarco v. Lehman Bros.,* 309 F. Supp.2d 631, 636 S.D.N.Y. 2004); *Credit Suisse,* 1998 WL 734365, at *7 (citing *Ganino v. Citizens Utils. Co,* 228 F.3d 154, 167 (2d Cir.2000) which states that a truth-on-the-market defense is "intensely fact-specific" and "rarely an appropriate basis for [dismissal]").

Finally, the fact that Mr. Loveless and Mr. Buck made additional purchases after the class period closed on March 21, 2002 does not mean that they did not rely on the integrity of the market price when they purchased during the class period. Purchasing shares after a corrective disclosure is a common investment technique known as "dollar-cost averaging" and does not defeat reliance.  *In re Adobe Sys., Inc. Sec. Lit..,* 139 F.R.D. 150, 155 (N.D.Cal.1991) (discussing the fact that plaintiff may have known about the misrepresentation subsequent to the class period, but prior to his purchase of more of defendant's securities, does not at all rebut the presumption of reliance); *see also In re Arakis Energy Corp. Sec. Lit.*, 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999).

### G.    THE COMPLAINT ADEQUATELY PLEADS CONTROL PERSON LIABILITY OF DEFENDANT ARKOOSH

Section 20(a) of the Exchange Act provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as

such controlled person." 15 U.S.C. § 78t(a). Arkoosh is a control person of Diomed and liable under Section 20(a). Ultimately the issue of control is a question of fact not ordinarily ripe for resolution at the pleading stage. *In re Cabletron*, 311 F.3d at 41; *see also No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d at 945 (holding that whether or not a person is a control person is an intensely factual question). "To survive a motion to dismiss, a plaintiff need only plead facts supporting a reasonable inference of control." *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp.2d 407, 426 (S.D.N.Y. 2000).

Arkoosh's employment agreement with Diomed (attached as Exhibit 10.4 to the Feb. 14, 2002 8-K which is submitted as Exhibit 2 of Defendants' Request for Judicial Notice) states that Arkoosh's role as Chairman "will include the leadership and direction of the Board, supervision and mentoring of the CEO and other duties… ." Clearly, the allegations regarding Arkoosh's role as Chairman are sufficient for control person liability. *See Bray v. R.W. Technology, Inc.,* 1990 WL 44084, at *3 (D. Mass Apr. 3, 1990), and cases cited therein; *In re Allaire Corp. Sec. Lit.*, 224 F. Supp. 2d at 340-341 (individual defendants who were senior executives of the company had control person liability).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request the Court issue an Order denying the motion to dismiss in its entirety.

Respectfully submitted,

DATED: November 19, 2004                LAW OFFICE OF SCOTT P. LOPEZ


\s\ Scott P. Lopez_____
Scott P. Lopez, Esq.
Law Office of Scott P. Lopez
24 School Street
8th Floor
Boston, Massachusetts 02108
Telephone: (617) 742-5700
Facsimile: (617) 742-5715

lopez@lopezlaw.com

Liaison Counsel for Plaintiffs

THE ROSEN LAW FIRM, P.A.
Laurence Rosen, Esq.
350 Fifth Avenue, Suite 5508
New York, NY  10118
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com

Lead Counsel for Plaintiffs