IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KENT GARVEY, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>      Plaintiff,<br><br>v.<br><br>JAMES ARKOOSH, SAMUEL BELZBERG, PETER KLEIN AND DIOMED HOLDINGS, INC.,<br><br>      Defendant. | CIVIL ACTION NO. 1:04CV10438 RGS |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

In a transparent attempt to avoid dismissal of their ill-conceived Amended Complaint, Plaintiffs reinvent it in their Memorandum by recasting their allegations, ignoring pertinent publicly-available documents and by misrepresenting the holdings of numerous cases. Significantly, Plaintiffs fail to cite even one case in support of the "novel" claim that under the securities laws an issuer's failure to disclose payments to third-party analysts gives rise to a cause of action. Moreover, Plaintiffs' Memorandum demonstrates conclusively that Defendants are not proper parties to this lawsuit. For these reasons, as more fully elaborated below, this Court should dismiss Plaintiffs' Amended Complaint with prejudice.

### Introduction

In their Memorandum, Plaintiffs attempt to amend their flawed Amended Complaint by improperly adding new allegations and misstating old ones. The following table provides just a few examples of Plaintiffs' self-serving revisionism:

| Plaintiffs' Memorandum | Amended Complaint |
|---|---|
| The cause of the increase in value of Diomed stock "was a well-coordinated | There are no allegations in the Amended Complaint of any |

| | |
|---|---|
| barrage of stock analyst reports that were secretly bought and paid for by Defendants." (Pls. Mem. at 1.) | coordination among Defendants and the analysts. |
| Defendants engaged in a scheme to inflate the price of Diomed stock by funneling money to the analysts "in return for issuing unmitigated BUY recommendations to investors." (Pls. Mem. at 1, 4-7, 10, 13, 15-16, 19 & 26-27.) | There are no such allegations in the Amended Complaint. Moreover, there are no allegations that Defendants had any say, input or involvement in the content of the analyst reports. |
| "The Complaint alleges that Defendants clandestinely directed these funds to a network of stock promoters that masqueraded as unbiased stock research analysts for the illegal purpose of manipulating the market price of Diomed stock." (Pls. Mem. at 1-2.) | There are no allegations in the Amended Complaint that Defendants paid a "network" of stock analysts or that the analysts held their reports out to be "unbiased" or "impartial." In fact, each of the analyst reports expressly and clearly disclosed that they were biased and that they had been compensated for their services. |
| The price of Diomed stock was directly affected by "secretly bribing" and "intentionally corrupt[ing]" stock analysts to manipulate the stock price. (Pls. Mem. at 3, 20.) | There are no allegations in the Amended Complaint that Defendants bribed or corrupted anyone. |
| *The Analyst Reports were False and Misleading.*" (Pls. Mem. at 8-13.) | There are no allegations in the Amended Complaint that the analyst reports were false and misleading. Indeed, Defendants pointed out the lack of such an allegation in their Initial Memorandum. |
| The Amended Complaint alleges "specific admissions by Abraham and Catalyst that they were approached and paid by Diomed and Verus to write the favorable analyst reports." (Pls. Mem. at 20.) | There are no such allegations in the Amended Complaint nor do Plaintiffs have any personal knowledge that Abraham or representatives of Catalyst ever said anything regarding payments by Diomed. |

Furthermore, Plaintiffs continue to stubbornly ignore and distort relevant facts in the

pertinent publicly-filed documents. For example, in their attempt to allege a "scheme engineered

by Arkoosh to manipulate the market of Diomed stock," Pls. Mem. at cover, Plaintiffs continue

to refer to an entity that does not exist, i.e., "Verus." As stated in Defendants' Initial

Memorandum, Diomed Holdings, Inc.'s (hereinafter "Diomed" or "Diomed Holdings, Inc.")

Form 8-K disclosed multiple Verus entities, including, but not limited to, Verus International Group Holdings, Inc. ("VIGL"), and Verus Support Services, Inc. ("VSSI").  (Def. Mem. at 7 n.4.)  The 8-K also discloses that the Verus entity engaged by Diomed and to whom Mr. Arkoosh's salary was paid, i.e., VSSI, was not the same entity for which Plaintiff allege Mr. Arkoosh served as COO and CFO, i.e., "Verus International Holdings" – a non-existent entity. (*Id.*)  This is just one example out of many evidencing the recklessness with which Plaintiffs pled their Amended Complaint.

Plaintiffs also distort, and in some cases, completely misrepresent, the holdings of many of the cases cited in their Memorandum.  For example, Plaintiffs argue that there are "legions of cases where courts have held that failing to disclose that an analysts' or brokers' BUY recommendation tainted by self-interest or made in bad faith is a material omission of fact violating §10(b)."  (Pls. Mem. at 10) (citing cases).  They also cite another series of cases which impose liability on analysts for failing to disclose "the paid promotional nature of those articles." (*Id.* at 8-9.)  However, none of these cases hold that the securities laws impose a duty on an *issuer* to disclose payments to third-party analysts.  No such authority exists.  The "authority" cited by Plaintiffs simply has no bearing on Plaintiffs' allegations.

Argument

**I.    Plaintiffs' Memorandum Demonstrates that Defendants are not Proper Parties to this Lawsuit.**

It is clear from the face of the Amended Complaint that Plaintiffs' claims against Diomed are based primarily on the theory of *respondeat superior*.  (AC ¶66.)  However, until Plaintiffs filed their Memorandum, it was not clear that Plaintiffs were alleging that Mr. Arkoosh's scheme to defraud ensued prior to the conclusion of the private placement and filing of Diomed's Form 8-K on February 14, 2002.  (Pls. Mem. at 22 ("These facts demonstrate that the 800,000 copies

of the Abraham report were distributed prior to Feb. 14, 2002 and helped create demand for the

private placement, which raised $10.0 million for Diomed.")).  Assuming the truth of this new

and improper allegation – as this Court would have to do if it had been alleged in the Amended

Complaint – the Court should dismiss the Amended Complaint because Plaintiffs have sued the

wrong parties.

The pertinent publicly-available documents conclusively demonstrate the following:  (a)

on February 11, 2002, Natexco Corporation changed its name to Diomed Holdings, Inc., *see*

Certificate of Amendment of Articles of Incorporation of Natexco Corporation, dated 2/11/02

(attached hereto as Exhibit A); (b) a subsidiary of Diomed Holdings, Inc. completed the merger

with the former Diomed, Inc. and filed the Form 8-K on February 14, 2002, *see* Diomed

Holdings, Inc. Form 8-K, dated 2/14/02, Item 5; and (c) Mr. Arkoosh was neither a director nor

Chairman of the Board of Diomed Holdings, Inc./Natexco Corporation on or before February 14,

2002, *see id.*, Merger Agreement, Ex. 99.1, at pp. 51-52.  Nevertheless, Plaintiffs have sued Mr.

Arkoosh in his capacity as Chairman of the Board of Diomed Holdings, Inc. and have sued

Diomed Holdings, Inc. primarily under a theory of *respondeat superior* arising solely out of the

conduct of Mr. Arkoosh acting on its behalf.  (AC ¶66.)  Because Mr. Arkoosh was not a director

of Diomed Holdings, Inc. at the time Plaintiffs allege the fraudulent scheme took place, neither

Diomed Holdings, Inc. nor Mr. Arkoosh can be liable for any alleged scheme.[1]

**II.      There is No Authority Supporting a Cause of Action Against An Issuer for Failing
to Disclose a Payment to a Third-Party Analyst.**

---

[1] Indeed, the entity known as Diomed Holdings, Inc. did not exist until Natexco Corporation changed its name on February 11, 2002.  *See* Ex. A.

Plaintiffs have failed to cite a single case that holds an issuer liable under the securities laws for failing to disclose a payment to a third-party analyst. Instead, Plaintiffs cite a laundry list of inapposite cases that hold analysts and investment advisors liable when the analyst or advisor fails to disclose an interest in a given security, writes a favorable report about that security, and then sells his interest in that security for a profit. In none of these cases, however, is the issuer found liable for the conduct or statements of the analyst. More importantly, in none of these cases is an issuer found to have violated the securities laws for failing to disclose the mere fact of payment to an analyst.

For example, Plaintiffs rely on *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979), in which investors brought suit under Section 10(b) against a financial columnist for the Los Angeles Herald Examiner. The columnist bought 5,000 shares from a company at a substantial discount below their market price and then wrote a favorable column about that company, which contained several material misrepresentations and omissions. The plaintiffs alleged that the columnist violated Rule 10b-5 by "publishing his column … without disclosing to his readers that he had bought [the company's] stock at a discount and intended to sell some of it upon the rise in market price he knew his column would cause." *Id.* at 1262-63. The court held that Rule 10b-5 "cover[s] the activities of one who uses a column as part of a scheme to manipulate the market and deceive the investing public." *Id.* at 1271.

In *SEC v. Huttoe*, 1998 WL 34078092 (D.D.C. Sept. 14, 1998), a case relied upon by Plaintiffs throughout their Memorandum, the SEC sued an independent research analyst for violation of Section 10(b) and also Sections 17(a) & (b) of the Securities Act of 1933. *Id.* at 1. The SEC alleged that the analyst violated Sections 17(a) and 10(b) by (a) touting securities to potential investors in articles he wrote in return for undisclosed compensation from the issuer;

(b) trading the issuer's stock as he was recommending their purchase to the public; and (c) failing to disclose his actions when selling subscriptions of his newsletter.  In addition, the SEC alleged that the analyst violated Section 17(b) by failing to disclose to his readers that he had received consideration in exchange for writing and publishing the newsletters.  *Id.* at 3.  The court found that the analyst's conduct violated the securities laws.  *Id.* at 3-12.

*Huttoe* and *Zweig*, like every other case relied upon by Plaintiffs, have nothing to with Plaintiffs' Amended Complaint.  Indeed, *Huttoe* emphasizes that Section 17(b) – which Plaintiffs stubbornly and improperly continue to rely on in their Memorandum despite its complete irrelevance to this case – "applies to any person who *publishes* any article which, though not purporting to offer a security for sale, describes such security for a consideration received…, directly or indirectly, from an issuer… without disclosing the consideration."  *Id.* at 9 (quoting *SEC v. Wall Street Publishing Inst., Inc.*, 851 F.2d 365, 369 (D.C. Cir. 1988) (quotations omitted) (emphasis added).  Defendants are not alleged to have published anything.

Plaintiffs also wrongly rely on *U.S. v. Cannistraro*, 800 F.Supp. 30 (D. N.J. 1992) & *U.S. v. Eisenberg*, 773 F.Supp. 662 (D. N.J. 1991), for the proposition that an issuer can be held liable under the securities laws for failing to disclose when it "compensates the publisher of a newsletter for a buy recommendation, with the intention of causing the price of the security to rise."  (Pls. Mem. at 6.)  Even if the Amended Complaint contained any allegations that Defendants compensated the third-party analysts in return "for a buy recommendation," (and it does not), *Cannistraro* and *Eisenberg* are inapposite.  Both decisions (which arise out of the same case) are criminal matters brought by the government against individuals for racketeering, conspiracy to commit racketeering and conspiracy to commit securities fraud.  Second, no issuer of publicly traded securities was a defendant in either case.  Third, both decisions involve

allegations that the defendants purchased securities with advance knowledge of favorable reports and then sold their securities for a profit. (There are no allegations of insider trading in the Amended Complaint.) Finally, despite Plaintiffs' insertion of the word "bribing" in their Memorandum, *see* Pls. Mem. at 3, there are no allegations in the Amended Complaint that Defendants bribed anyone. (The word appears nowhere in the Amended Complaint.) Most importantly, however, neither *Eisenberg* nor *Cannistraro* holds that an issuer can be liable under the securities laws solely for failing to disclose a payment to third-party analysts. *See Cannistraro*, 800 F.Supp. at 80-82; *Eisenberg*, 773 F.Supp. at 719-25.

Accordingly, because Plaintiffs have cited no authority supporting liability for an issuer's failure to disclose payments to third-party analysts, the Amended Complaint fails as a matter of law and should be dismissed.

## III. The Amended Complaint Fails to Comply with the Heightened Pleading Requirements of the Private Securities Litigation Reform Act of 1995.

It is not surprising that Plaintiffs make the odd assertion that "[i]t would also be improper for the plaintiffs to swear to those allegations in the Complaint which are made based in great part on their counsel's investigation."[2] Pls. Mem. at 20 n.12. Had Plaintiffs or their counsel performed the investigation that was required of them prior to filing their lawsuit, they would have discovered numerous relevant facts that demonstrate the falsity of their allegations. Significantly, had Plaintiffs' counsel reviewed only three publicly-available documents, they would have discovered the following:

- No entity called "Verus" has ever existed. Moreover, the entity that was engaged by Diomed and to whom Mr. Arkoosh's salary was paid, i.e., VSSI, was not the same entity which Plaintiff allege Mr. Arkoosh served as COO and CFO, i.e., "Verus International Holdings" – a non-existent entity.

---

[2] Nevertheless, Plaintiffs' counsel does just that when he attests to the validity of a document allegedly depicting Diomed's trading history during the Class Period in the Declaration attached to Plaintiffs' Memorandum.

    (Diomed Holdings, Inc. Form 8-K, dated 2/14/02, Merger Agreement, Exs. 10.3, 10.4 & 99.1 at pp. 53, 58.)

- "Verus" did not own 15.2% of Diomed stock. After the merger, Verus Investment Holdings, Inc. – a company with which Mr. Arkoosh had no involvement – owned approximately 7% of Diomed's outstanding common stock equivalents and VIGL owned another approximately 8%. (Diomed Holdings, Inc. Form 8-K, dated 2/14/02, Merger Agreement, Ex. 99.1 at pp. 67-77.)

- Mr. Arkoosh did not own 131,750 shares of Diomed stock. At the time of the merger, Mr. Arkoosh owned 25,125 shares of preferred stock, convertible into 100,500 shares of common stock, as well as options to purchase up to 100,000 shares of common stock. Prior to the merger, Mr. Arkoosh did not own any Diomed common stock. (*See* James Arkoosh SEC Form 3, dated 2/15/02.)

- Mr. Arkoosh could not have sold his stock as part of any alleged "pump and dump scheme" because it was unregistered and restricted preferred stock. (Diomed Holdings, Inc. Form 8-K, dated 2/14/02, Merger Agreement, Ex. 4.2.)

- Plaintiffs' attempt to tie Mr. Arkoosh's employment contract to the alleged "pump and dump scheme" makes no sense because that contract was dated July 2001 when he became Chairman of the former Diomed, Inc., *see id.* at Ex.10.4, and there are no allegations in the Amended Complaint that the alleged scheme to defraud began over eight months before the merger was completed.

- Mr. Arkoosh was not Diomed's "financial consultant." (*Id.*; *see* Pls. Mem. at cover.)

- On December 31, 2002, the effective date of Mr. Arkoosh's resignation from the Diomed Board, he retained precisely the same amount of securities as he did on February 15, 2002. (*See* James Arkoosh SEC Form 5, dated 2/2/03.)

The failure of Plaintiffs and their counsel to review crucial publicly-available documents is wholly inconsistent with a party's duty to file pleadings in good faith after a reasonable investigation of the facts.[3]

---

[3] Also telling is Plaintiffs' misrepresentation of the contents of their own exhibits. In an attempt to show that Defendants were manipulating the price of Diomed stock, Plaintiffs incorrectly assert that "Diomed shares rocketed to $9.0 per share" within three days of completion of the merger. (Pls. Mem. at 1 & Rosen Declaration, Ex. A.) However, the exhibit attached to Mr. Rosen's declaration plainly discloses that Diomed stock never closed at $9.0

Furthermore, Plaintiffs' Memorandum confirms the assertion in the Amended Complaint that Plaintiffs lack any personal knowledge of the facts alleged therein.  (*See* AC at p. 1.) Plaintiffs state that, "*Perhaps* that was the attraction of using Catalyst as the go-between," (Pls. Mem. at 21), and, "Moreover, one *wonders* why Arkoosh's compensation as Chairman was paid directly to Verus." (*Id.* at 23) (emphasis added).  The heightened pleading requirements of the PSLRA do not permit Plaintiffs to speculate or to "wonder."  They require Plaintiffs to "state with particularity all facts on which that belief is formed."  15 U.S.C. §78u-4(b)(1)(B).  Plaintiffs have made no attempt to do so.

Then there is the matter of Diomed's engagement of VSSI and its employment of Mr. Arkoosh.  Plaintiffs concede, as they must, that the 8-K discloses Diomed's engagement of VSSI for pre- and post-merger advisory services as well as the compensation that VSSI would receive in exchange for those services.  (Diomed Holdings, Inc. Form 8-K, dated 2/14/02, Merger Agreement, Ex. 10.3.)  Plaintiffs also concede that the 8-K discloses the terms of Mr. Arkoosh's employment contract, specifically that Mr. Arkoosh would be compensated at an annual rate of $50,000, and that this money would be paid directly to VSSI so long as Mr. Arkoosh remained an employee of VSSI.  (*Id.* Ex. 10.4.)  Nevertheless, while appearing nowhere in their Amended Complaint, Plaintiffs boldly assert that "the *true purpose* of the financial advisory payments was a material fact – as the price of Diomed stock was directly affected by secretly bribing stock analysts to manipulate the stock price."  (Pls. Mem. at 3) (emphasis added).  In support of this allegation, Plaintiffs point to nothing other than hearsay and double hearsay statements by third-parties in the March 21, 2002 Dow Jones news article:

> Defendants' involvement in the unlawful scheme is quite clear.  The [Amended] Complaint attaches an article dated March 21, 2002 written by award winning

---

per share and, on the date identified by Plaintiffs as being material, actually closed at $6.0 per share.  Plaintiffs have alleged no facts linking that $9.0 amount to any conduct of Defendants.

financial journalist Carol S. Remond for Dow Jones, stating Abraham admitted he was approached by Diomed and Catalyst to write his bullish February 2002 report. In addition, Ms. Remond states that in phone interviews, Bart Walters, the owner of a Florida firm named Catalyst Communications, admitted to having been paid $700,000 by Verus to hire Larry Abraham and produce and distribute over 800,000 copies of Larry Abraham's "Insider Report" to prospective investors. Catalyst Communications' co-owner Patrick Kephart has been previously charged by the SEC for paying bribes to induce stock-brokers to sell certain securities to their clients. In addition, lead counsel for plaintiffs personally spoke with Carol Remond, who confirmed that each of the statements set forth in her March 21, 2002 Dow Jones news article are true and correct.

(*Id.* at 2) (discussing article attached as Exhibit B to the Amended Complaint.)[4]

The PSLRA requires Plaintiffs to "state with particularity" all facts supporting their claims. 15 U.S.C. §78u-4(b)(1)(B); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1991) (holding that the PSLRA requires a plaintiff to (a) allege the time, place and content of the alleged misrepresentations or omission with specificity; (b) identify the speaker; (c) state when and where the statements or omissions were made; and (d) explain *why* each statement was fraudulent). Allowing Plaintiffs to proceed with a lawsuit on the basis of double hearsay statements from third-parties, unsupported information and belief pleading and other objectively false factual allegations would render the heightened pleading requirements of the PSLRA meaningless.[5]

Moreover, Plaintiffs' math is equally speculative, result-oriented and, in some instances, unintelligible. According to Plaintiffs' Memorandum, $822,500 was paid by Diomed to "Verus" for financial consulting. Plaintiffs reach the $822,500 figure by combining the $750,000

---

[4] Significantly, the Dow Jones article does not state that either Diomed or Mr. Arkoosh actually made any payments to third-party analysts. (AC, Ex. B.)

[5] Plaintiffs posit that their reliance on double hearsay statements is reasonable because their counsel supposedly had a conversation with the author of the Dow Jones article in which she "confirmed" the truth of the hearsay. Even if such a "confirmation" could cure Plaintiffs' pleading failures (and it could not), Plaintiffs' counsel has refused to provide an affidavit or declaration attesting that such a conversation occurred, arguing that such an affidavit would be "improper." (Pls. Mem. at 20 n.12.) This argument defies logic given that Plaintiffs' counsel attached a declaration to Plaintiffs' Memorandum in which counsel attests to the validity of a "chart of Diomed's trading history during the Class Period." (*Id.* at 1 n.1.)

advisory fee paid by Diomed to "Verus" on February 14, 2002 with the $30,000 per month that "Verus" was to receive from Diomed for post-merger advisory services[6] and the $50,000 paid to "Verus" on a quarterly bases for Mr. Arkoosh's salary.  (*Id.* at 11-12.)  Plaintiffs then make the unremarkable observation that their concocted $822,500 figure "approximates the $875,00 that Stockwatch states was paid to Catalyst Communications of which Catalyst paid $700,000 for Abraham's report, $50,000 to OTC Journal, $100,000 to Small Cap Digest, and an unknown amount to Stockwatch."  (*Id.* at 12.)  These mathematical gymnastics are insufficient as a matter of law and do not constitute "facts," let alone the pleading required by the PSLRA.  Accordingly, the Amended Complaint should be dismissed.

**IV.     The Amended Complaint Does Not Otherwise Allege a False Statement or Omission.**

Plaintiffs devote an entire section of their Memorandum to the argument that "Defendants' Misstatements and Omissions Violated the Securities Laws."[7]  (Pls. Mem. at 7-8.)  The Amended Complaint contains no such allegations.  The only claim alleged in the Amended Complaint is that Defendants failed to disclose payments to third-party analysts.  Because there is no duty under the securities laws to disclose a payment to a third-party analyst, Plaintiffs have not alleged a cognizable claim.

Furthermore, in an astounding course-correction, no doubt as a result of Defendants' Motion to Dismiss, Plaintiffs now assert for the first time that the "*Analyst Reports* were False and Misleading."  (*Id.* at 8-11) (emphasis added.)  Yet, nowhere in the Amended Complaint do Plaintiffs allege that the analyst reports contained false statements.  But even if they had, Plaintiffs have not sued the analysts; they have sued Diomed and Mr. Arkoosh.  Under the

---

[6] Contrary to Plaintiffs' Memorandum, the Form 8-K plainly discloses that Diomed agreed to pay VSSI a $15,000 per month advisory fee and reimburse VSSI for expenses up to an additional $15,000 in total.  (Diomed Holdings, Inc. Form 8-K, dated 2/14/02, Merger Agreement, Ex. 10.3.)

[7] Plaintiffs also argue that Rule 10b-5 does not require them to plead a false or misleading statement.  (Pls. Mem. at 13-15.)  This argument is irrelevant and need not be addressed here because Plaintiffs have pled no misstatements or omissions of fact in the Amended Complaint.

clearly established law of this Circuit, Defendants cannot be held liable for any alleged misstatements or omissions in the analyst reports unless Plaintiffs allege that Defendants (a) distributed the analyst reports; (b) supplied any information for the reports; (c) edited or otherwise reviewed the content of the reports before they were published; (d) consulted with the analysts about the content of the reports; or (e) approved of, or otherwise expressed comfort with, the content of the reports. *See In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F.Supp.2d 1, 31 (D. Mass. 1999) (allegations that defendants provided numerous documents to analysts and had a "pattern of continuous interactions" with the analysts are insufficient to state a claim under the entanglement test).

Recognizing their failure to allege any such facts, Plaintiffs now argue in their Memorandum that Defendants asked the analysts to write reports containing a "buy recommendation." (Pls. Mem. *passim*.) Tellingly, the Amended Complaint contains no allegations that Defendants had any interactions with any of the analysts that would justify this assertion. Moreover, even if there was such an allegation, Plaintiffs were required to "allege with particularity the time, place, content, and speaker of the issuer's communications with the analysts, and explain why the communications were fraudulent." *In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 55 (D. Mass. 1998). Plaintiffs have made no attempt to do so. Furthermore, Plaintiffs' naked attempt to evade dismissal under the entanglement test by blithely asserting that "substantial payments [to analysts] are precisely what the First Circuit had in mind when it established the 'entanglement' test" is equally without merit. (Pls. Mem. at 13.) Despite such a grandiose pronouncement, Plaintiffs fail to cite any authority from this Circuit or any other circuit that supports such a conclusion. No such authority exists. For this reason, the Amended Complaint should be dismissed.

**V.     The Forward-Looking Statements and Cautionary Language in the Analyst Reports Negate the Materiality of any Misstatements or Omissions in Those Reports, Had any Been Alleged.**

First, in a startling concession, Plaintiffs admit that "Defendants do not and cannot point to any forward looking statements that are alleged in the [Amended] Complaint to have been false or misleading." (Pls. Mem. at 15 n.8.) On this point, at least, Defendants and Plaintiffs agree. Accordingly, even if Defendants could be liable under the First Circuit's entanglement test, and even if Plaintiffs had alleged a misstatement or omission of fact in the analyst reports regarding the future prospects of Diomed and its stock, such statements or omissions are not material as a matter of law. *See In re Sepracor, Inc. Sec. Litig.*, 308 F.Supp.2d 20, 27 (D. Mass. 2004) (holding that forward-looking statements are not actionable if a plaintiff does not plead that the statement was made with actual knowledge that the statement was false or misleading).

Second, Plaintiffs completely misconstrue Defendants' argument with respect to the cautionary language found in each of the analyst reports. (Pls. Mem. at 16 (stating that "none of the above statements disclose that Diomed had paid $700,000 to Abraham to issue the buy recommendation for Diomed stock.")) Assuming *arguendo* that Plaintiffs at some point attempted to allege particularized facts in an attempt to satisfy the entanglement test, and could allege material misrepresentations or omissions in the analyst reports, the cautionary language would negate the materiality of those misrepresentations or omissions.

Furthermore, the disclosures in the analyst reports at issue in this case are hardly "boilerplate." (*Id.* at 16-17.) For example, the Abraham report discloses that (a) the distribution of the report was funded at a cost of $700,000; (b) a consulting company received a fee of $5,000 for due diligence on Diomed and was expected to receive Diomed stock for their services; (c) Abraham and his publisher were to receive new subscriber revenue as a result of the report; and

(d) such compensation constitutes "an inherent conflict of interest." (AC, Ex. A.) Likewise, the Small Cap Digest reports disclose that the publisher had been paid $50,000 for publishing the articles. (*Id.*, Exs. D-G.) These disclosures, along with the other cautionary language identified in Defendants' Initial Memorandum at p. 19, were sufficient to warn investors that the analyst reports were anything but unbiased and impartial.[8] *See In re Boston Tech, Inc.*, 8 F.Supp.2d at 53 (defining the bespeaks caution doctrine).[9] For these reasons, granting Plaintiffs leave to replead would be futile and the Court should dismiss the Amended Complaint with prejudice.

## VI.    The Amended Complaint Fails to Adequately Plead Scienter

Plaintiffs demonstrate their fundamental misunderstanding of the federal securities laws when they argue in their Memorandum that "if … the Complaint alleges a scheme, a material misstatement or omission, or a fraudulent course of business, then clearly there is a strong inference of scienter." (Pls. Mem. at 18.) Under Section 10(b), the scienter inquiry is wholly separate from the question of whether there has been a material misstatement or omission of fact. *See In re Sepracor, Inc.*, 308 F.Supp.2d at 27 (listing elements of claim under Section 10(b)); *see also* 15 U.S.C. §78u-4(b)(2) (requiring that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"). Therefore, even if the securities laws impose a duty on an issuer to disclose payments to third-party analysts (and they do not), Plaintiffs had an affirmative obligation to plead particularized facts giving rise to a strong inference that Defendants failed to disclose those alleged payments with the appropriate level of scienter. Plaintiffs' failure to do so mandates dismissal of the Amended Complaint. *See*

---

[8] Nevertheless, as discussed below, Plaintiffs Marsh, Buck and Garvey purchased their Diomed stock after the alleged fraud was revealed in the March 11, 2002 New York Post article. *See infra* Part VII.

[9] Furthermore, Plaintiffs' argument that "investors were paying Abraham for what they believed was unbiased impartial research" simply because Insider Report was a subscription-based newsletter is completely illogical and belied by the plain meaning of the disclosures in the Abraham report. (Pls. Mem. at 17.)

15 U.S.C. § 78u-4(b)(3)(A) (requiring dismissal of a complaint for a plaintiff's failure to comply with the pleading requirements of the PSLRA).

Plaintiffs argue that Defendants' "scheme to purchase BUY recommendations and high price targets in exchange for cash was a conscious, deliberate business strategy." (Pls. Mem. at 19.)  However, this allegation is not in the Amended Complaint.  Nowhere do Plaintiffs allege that Defendants sought out "BUY recommendations" as part of some sort of "business strategy."

Plaintiffs' arguments regarding the date on which the Abraham report was published are, like the Amended Complaint, based wholly on conjecture and speculation.  (*Id.* at 21-22 (asking "what monthly financial magazine or newsletter hits the newsstands or is distributed after the fourteenth of the month?")).  Nevertheless, the Amended Complaint and other documents attached to Plaintiffs' pleadings demonstrate the following undisputed facts:  (a) the private placement was completed on February 14, 2002 (AC ¶21); (b) Diomed stock had already been trading on the AMEX when the Abraham report was published (AC, Ex. A); (c) Diomed stock did not begin trading on the AMEX until February 19, 2004 (Pls. Mem., Rosen Declaration, Ex. A).  Accordingly, Plaintiffs' allegation that the Abraham report "was used to create a strong demand for Diomed's $10.0 million private placement" is an objectively false misrepresentation of publicly-available documents.  This allegation cannot, therefore, give rise to a strong inference of scienter.

Regarding Mr. Arkoosh's Diomed stock ownership, Plaintiffs now concede that the Amended Complaint does not allege that Arkoosh sold his stock during the class period.  (*Id.* at 22.)  Plaintiffs now appear to be arguing that Defendants simply had the motive and opportunity to commit fraud, even if they did not benefit from the fraud.  (*Id.*)  Nevertheless, "[c]onclusory allegations that the defendants stood to personally benefit from the inflation of [a company's]

revenues and 'had the opportunity to commit fraud' do little to advance matters." *In re Segue Software, Inc. Sec. Litig.*, 106 F.Supp.2d 161, 171 & n.23 (D. Mass. 2000) (Stearns, J.).

Furthermore, Plaintiffs' speculation that Mr. Arkoosh *might* have sold his stock, Pls. Mem. at 22, is once again belied by the pertinent publicly-filed documents. Plaintiffs stubbornly refuse to acknowledge that Mr. Arkoosh *could not have sold his Diomed stock* because his stock was unregistered and restricted preferred shares. (Diomed Holdings, Inc. Form 8-K, dated 2/14/2002, Merger Agreement, Ex. 4.2.). Thus, this Court's decision in *Crowell v. Ionics, Inc.*, 2004 WL 2475332 (D. Mass. Nov. 4, 2004)[10], which addresses the impact on the scienter analysis of the absence of "stock trading profit" is simply inapposite. The issue before this Court is not just the absence of profit, or even the absence of trading, but the *inability to trade*. Accordingly, the "submitted filings" in this case "conclusively establish that [Mr. Arkoosh] engaged in no stock trading during the Class Period."[11] *Crowell*, 2004 WL 2475332, at *13.

In addition to their pleading deficiencies, Plaintiffs knowingly misrepresent the law by continuing to argue that Section 17(b) of the Securities Act applies to this case. By its plain language, this statute provides that "[i]t shall be unlawful for any person … *to publish, give publicity to, or circulate any ... article ...* which … describes such security for a consideration received or to be received … without fully disclosing the receipt … of such consideration and the amount thereof." 15 U.S.C. 77q(b) (emphasis added). Defendants are not alleged to have published, given publicity to or circulated anything. Nevertheless, Plaintiffs compound their

---

[10] *Crowell* was decided after Defendants' filed their Motion to Dismiss.

[11] Plaintiffs' other allegations regarding Mr. Arkoosh's motive to commit fraud are also based on objectively false facts, including the assertions that he owned 131,000 shares of Diomed stock, when he did not, and that he served as COO and CFO of "Verus," when no such entity has ever existed. (*See* James Arkoosh SEC Form 3, dated 2/15/02 & Diomed Holdings, Inc. Form 8-K, dated 2/14/02, Merger Agreement, Exs. 10.3, 10.4 & 99.1 at p.58.) Furthermore, Plaintiffs' attempt to tie Mr. Arkoosh's employment contract to the alleged "pump and dump scheme" makes no sense because that contract was dated July 2001 when he became Chairman of the former Diomed, Inc., *see* Diomed Holdings, Inc. Form 8-K, dated 2/14/02, Merger Agreement, Ex.10.4, and there are no allegations in the Amended Complaint that the alleged scheme to defraud began over eight months before the merger was completed.

misrepresentations by citing *U.S. v. O'Hagan*, 521 U.S. 642, 644 (1997), and *Huttoe* for the proposition that an issuer can be held liable under Sections 17(b) and 10(b) for paying third-party analysts. Neither *O'Hagan* nor *Huttoe* addresses this issue. And even if there were authority supporting a civil action under Section 17(b) against an issuer for failing to disclose a payment to a third-party analyst, a securities plaintiff cannot state a claim under Section 10(b) simply by *alleging* that a defendant violated Section 17(b).

Finally, Plaintiffs ask the Court to view the totality of their scienter allegations. (Pls. Mem. at 23.) Whether Plaintiffs' allegations are viewed singularly or collectively is irrelevant because each and every one of them has no merit. As discussed herein and in Defendants' Initial Memorandum at pp. 21-22, the Amended Complaint's "additional" or "peripheral" scienter allegations are based entirely on the misrepresentation of publicly-available facts and undisputed law. Such baseless allegations cannot give rise to a strong inference of scienter. For this reason, the Amended Complaint should be dismissed.

## VII.  The Amended Complaint Fails to Properly Allege Reliance.

Because an issuer has no duty under the securities laws to disclose payments to third-party analysts, the *Affiliated Ute* presumption of reliance cannot apply in this case.[12] (Pls. Mem. at 25.) Moreover, despite affirmatively pleading that the fraud on the market theory applies because "Defendants made misleading public statements or failed to disclose material facts during the Class period," AC, ¶59, Plaintiffs have pled no misrepresentations or omissions of fact in the Amended Complaint. (Pls. Mem. at 25-26.) Plaintiffs' reliance on *LaGrasta v. First Union Securities, Inc.*, 358 F.3d 840 (11th Cir. 2004), is unavailing because that case does not

---

[12]In support of its reliance allegations, Plaintiffs argue in their Memorandum they have "demonstrated … that every court to address the issue has held that an analyst's receipt of consideration from a company on which he is reporting is a material fact that must be disclosed." (Pls. Mem. at 27.) This proposition is, of course, wholly irrelevant here because Plaintiffs did not sue the analysts to whom this disclosure obligation applies.

support the imposition of liability on an issuer for failing to disclose a payment to a third-party analyst.

In the absence of a presumption of reliance, Plaintiffs must have adequately alleged reliance with the particularity required by the PSLRA.  Plaintiffs have made no attempt to do so. Instead, Plaintiffs make a series of untenable arguments about when they received notice of the fraud.  Plaintiffs argue that "they purchased their shares without knowledge of the material adverse information and in reliance on the integrity of the market" because the New York Post – which disclosed the alleged fraud for the first time on March 11, 2002 – is "essentially a local newspaper" and thus is somehow not part of the market.  (Pls. Mem. at 27.)  Plaintiffs cannot have it both ways.  They cannot argue that the New York Post – a newspaper with a circulation of nearly 600,000 in 2002 (the eighth largest circulation in the country)[13] – is not sufficiently part of the market to place Messrs. Marsh, Buck and Garvey on notice of the alleged fraud, while at the same time arguing that Larry Abraham's Insider Report is a valid and noteworthy news source that entitles them to rely on the market to state a claim under Section 10(b).  Moreover, Plaintiffs' argument that the Post article was "not a corrective disclosure" is belied by their own Memorandum, in which they argue that Mr. Arkoosh's "scheme was uncovered within weeks by the [New York] Post and Dow Jones."  (*Id.* at 23.)  Such sophistry undermines every allegation in the Amended Complaint.

Finally, Plaintiffs rely on authority from other jurisdictions – as they do throughout their Memorandum – for the proposition that a plaintiff can have knowledge of an issuer's alleged fraud, and then knowingly purchase that issuer's securities, and still be permitted to avail himself of the fraud-on-the-market theory of reliance.  (*Id.* at 28 (citing *In re Adobe Sys., Inc. Sec. Litig.*,

---

[13] *See* http://www.infoplease.com/ipea/A0004420.html, accessed December 2, 2004.  The figures provided by the referenced web site are as of September 30, 2002, just over six months after the New York Post published the article relied upon by Plaintiffs.

139 F.R.D. 150, 155 (N.D. Cal. 1991)).  To the extent *Adobe* – which reached the issue as part of

a typicality analysis in a motion for class certification – stands for such an illogical proposition, it

should be disregarded.[14]

**VIII.    The Amended Complaint Fails to State a Claim for Controlling Person Liability.**

Because Plaintiffs have failed to allege a primary violation of Section 10(b), their

derivative claim against Mr. Arkoosh fails as a matter of law.  *See Suna v. Bailey Corp.*, 107 F.3d

64, 72 (1st Cir. 1997).  If the Section 10(b) claim survives Defendants' Motion to Dismiss, the

derivative claim should still be dismissed because (a) Mr. Arkoosh is named in both claims and

Plaintiffs are not entitled to a double recovery, *see e.g., PR Diamonds, Inc. v. Chandler*, 364 F.3d

671, 697 n.4 (6th Cir. 2004); (b) Mr. Arkoosh was not a controlling shareholder of Diomed, (Defs.

Mem. at 27-28); and (c) Plaintiffs have failed to plead that Mr. Arkoosh "controlled" Diomed in

his capacity as non-executive Chairman of Diomed's Board of Directors.

Plaintiffs do not dispute that Mr. Arkoosh was not a controlling shareholder or that they

are not entitled to a double recovery.  Instead, Plaintiffs argue that Mr. Arkoosh was a controlling

person because of language in his employment contract.  (Pls. Mem. at 29.)  However, Plaintiffs

omit that this same contract affirms that Mr. Arkoosh was the "Non-executive" Chairman of

Diomed.  (Diomed Holdings, Inc. Form 8-K, dated 2/14/02, Merger Agreement, Ex. 10.4.)  It is

well-settled that one's "status as a director is not enough to meet the threshold pleading

requirements for a § 20(a) claim."  *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 43 (Bankr.

D. Mass. 2002).  Furthermore, given that Plaintiffs have no personal knowledge about any of the

facts alleged in the Amended Complaint, specifically their conclusory allegation that Mr.

Arkoosh was the "engineer[]" of a scheme to defraud Diomed's stockholders, Pls. Mem. at cover,

---

[14] Moreover, even if this Court were to adopt the reasoning in *Adobe*, it should still dismiss Messrs. Marsh, Buck and Garvey because each of these individuals purchased all of their Diomed stock at the time of, or soon after, the alleged fraud was revealed.

and therefore have no knowledge whether Mr. Arkoosh actually exercised control over Diomed, Plaintiffs cannot state a claim under Section 20(a) consistent with the heightened pleading requirements of the PSLRA.

**Conclusion**

Parties and their counsel have a duty to investigate the facts of a case before filing a lawsuit.  Evidently, this investigation did not take place in this case.  The PSLRA does not permit a party to move forward with a lawsuit that has no reasonable basis in law or fact.  To the contrary, it compels dismissal.  Defendants respectfully request that the Amended Complaint be dismissed with prejudice and that they be awarded their attorneys' fees and costs incurred in responding Plaintiffs' baseless claims.

Respectfully submitted,

JAMES ARKOOSH and
DIOMED HOLDINGS, INC.

By Counsel

Of Counsel

   /s/ James J. Foster_____

Charles Wm. McIntyre (VSB# 27480)          James Foster (BBO #553285)
McGuireWoods LLP                           Wolf, Greenfield & Sacks, P.C.
Washington Square                          600 Atlantic Avenue
1050 Connecticut Avenue, N.W., Suite 1200  Boston, MA 02210-2206
Washington D.C. 20036                      617.646.8000 (phone)
202.857.1742 (phone)                       617.646.8646 (fax)
202.828.2967 (fax)                         jfoster@wolfgreenfield.com

Brian E. Pumphrey (VSB# 47312)
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
804.775.7745 (phone)
804.698.2018 (fax)

# EXHIBIT A

FILED # C 4396-98

FEB 1 1 2002

IN THE OFFICE OF
DEAN HELLER, SECRETARY OF STATE

CERTIFICATE OF AMENDMENT
OF ARTICLES OF INCORPORATION

OF

NATEXCO CORPORATION

The undersigned Company, in order to amend its Articles of Incorporation, hereby certifies as follows:

FIRST:  The name of the Company is Natexco Corporation.

SECOND:  The Company hereby amends its Articles of Incorporation as follows:

Article First of the Company's Articles of Incorporation is amended to change the name of the Company.  Said Article First of the Articles of Incorporation is hereby deleted in its entirety and substituted by the following in its place and stead:

"FIRST.  Name.  The name of the corporation is:

DIOMED HOLDINGS, INC."

THIRD:  The vote by which the stockholders holding shares in the corporation entitling them to exercise at least a majority of the voting power, or such greater portion of the voting power as may be required in the case of vote by classes or series, or as may be required by the provisions of the articles of incorporation have voted in favor of the amendment is 5,623,900 (61.1%).

IN WITNESS WHEREOF, the undersigned hereby executes this document and affirms the facts set forth herein are true under penalties of perjury as of this 6th day of February, 2002.

Gerald A. Mulhall
President

Anthony Mulhall
Secretary

302084 v1