UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10438-RGS

KENT GARVEY, On Behalf of Himself
and Others Similarly Situated,

v.

JAMES ARKOOSH and
DIOMED HOLDINGS, INC.,

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION TO DISMISS

February 4, 2005

STEARNS, D.J.

This class action was brought on behalf of investors who purchased Diomed

Holdings, Inc. (Diomed), common stock during the period from February 14, 2002, through

March 21, 2002 (the Class Period).   Plaintiffs allege violations by Diomed and its

Chairman, James Arkoosh, of Sections 10(b)[1] and 20(a)[2] of the Securities Exchange Act

---

[1]Section 10(b) provides that it is unlawful for a person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . ." 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated thereunder, provides that it is unlawful for a person "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

[2]Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

of 1934, and associated Rule 10b-5.   Plaintiffs allege that the price of Diomed stock was artificially inflated by a scheme in which stock analysts were secretly paid to praise Diomed and its stock.   Defendants move to dismiss the Amended Complaint.

BACKGROUND

The facts alleged in the Amended Complaint are as follows. Diomed is a Delaware corporation with a principal place of business in Andover, Massachusetts.   Diomed sells photodynamic equipment used in the treatment of cancer and the melioration of varicose and spider veins.   (Amended Complaint, at ¶ 17).

On February 14, 2002, Diomed Acquisition Company, a wholly owned subsidiary of Diomed, merged with Diomed in a reverse merger.[3]   Simultaneously with the merger, Diomed conducted a $10 million private placement offering of its common stock.   Investors purchased five million Diomed shares at $2.00 per share.

Upon completion of the merger, Arkoosh acquired the unusual title of Non-Executive Chairman of Diomed's Board of Directors.   In that role he actively participated in the drafting of Diomed's Securities and Exchange Commission (SEC) filings and press releases.   (Amended Complaint, at ¶ 18).   Arkoosh owned 131,750 shares of Diomed stock.   Arkoosh was also the Chief Financial Officer (CFO) and Chief Operating Officer (COO) of Verus International Holdings (Verus), which as the owner of 15.2% of Diomed's stock, was Diomed's largest single shareholder.   (Amended Complaint, at ¶ 8).   Plaintiffs claim that in addition to Arkoosh's overlapping managerial roles, Diomed and Verus shared

---

[3]In a reverse merger, a publicly held shell company acquires a privately held company, which is then "reverse merged" into the publicly traded company.

a monetary link.  Diomed is alleged to have paid a "Verus affiliate" a $750,000 fee, a monthly retainer of $15,000, and up to $15,000 a month in expenses in exchange for financial advisory services.  Finally, Arkoosh's $50,000 annual salary at Diomed was paid to Verus, which also received 50,000 shares of Diomed common stock.  (Amended Complaint, at ¶ 31; Diomed Holdings, Inc., Form 8-K, dated 2/14/02).

Plaintiffs allege that defendants devised a plan to artificially inflate the price of Diomed's stock by secretly paying stock analysts to tout Diomed to unsuspecting investors. According to plaintiffs, defendants were engaged in what is colloquially called a "pump and dump" scheme.  (Amended Complaint, at ¶ 5).[4]  Four stock newsletters form the basis of plaintiffs' allegations, the contents of which are summarized below.

1.  <u>The Insider Report</u>

In early February of 2002 (no specific date is identified in the Amended Complaint[5]), stock analyst Larry Abraham published a special issue of *Insider Report* titled "Special Situation Report: Diomed: Portrait of a Biotech Winner."  The Report gave Diomed a "glowing review" and a strong buy recommendation.  It urged readers to:

---

[4]In a typical "pump and dump" scheme, insiders inflate demand for a stock by disseminating laudatory information about a company – information that is usually false. If the market reacts favorably, the insiders cash in their shares before the market readjusts and the share price collapses.

[5]The parties dispute the date on which this report was likely to have been published. Plaintiffs claim that the report had to have been issued before the February 14, 2002 private placement because "what monthly financial magazine or newsletter hits the newsstands or is distributed after the fourteenth of the month?"  Plaintiffs' Opposition, at 21.  Defendants contend that the report was distributed after February 14, 2002, because it advises readers that Diomed stock is traded on the American Stock Exchange (AMEX). According to defendants, Diomed was not listed on the AMEX until February 19, 2002.

> BUY Diomed, Inc. and do it now. . . . I can tell you without reservation that [it] meets every criteria that I have developed and paid dearly to refine.  It has the science, the people, the money, and a great business model, plus a timeline for profitability that is here and now, not 15 or five years from now. (Amended Complaint, at ¶ 26, and Ex. A).

> I urge my *Insider Report* readers to participate in the Diomed opportunity along with me by contacting their brokers. . . . So let me repeat: Buy Diomed (DIO:Amex) and do it now. (Amended Complaint, at ¶ 27, and Ex. A).

The report also disclosed the fact that the publisher of *Insider Report* stood to benefit from

Abraham's positive report on Diomed.

> The distribution of this newsletter report on Diomed and potential new subscribers was funded at a cost of approximately $700,000.  Catalyst Communications received and administered this production budget. . . . Larry Abraham and his publisher expect to receive new subscriber revenue as a result of this mailing, the amount of which is unknown at the time of publication.  (Amended Complaint, Ex. A).

2. SmallCap Network Newsletter Digest

Plaintiffs allege that the investment newsletter *SmallCap Network Newsletter Digest*

wrote glowing reports about Diomed on February 22, 26, and 27, 2002, and on March 4

and 13, 2002.  (Amended Complaint, at ¶ 35).  All of the reports begin with a brief

laudatory statement about Diomed, and are followed by a press release, the source of

which is identified as Diomed.  A sampling of the newsletters is as follows.

A. February 26, 2002:  "Diomed in the Rough"

> We are very excited about our most recent profile, Medical device maker Diomed (DIO) is a 'picks & shovels' company in the photodynamic therapy industry . . . investors in Diomed should realize that the company is also the first to receive FDA approval for EVLT (treatment of varicose veins).  Diomed is no

one trick pony. . . . The stock closed today at $7.30 which is up 5% from when we profiled the company. It has pulled back from the $8.50 level which is a great opportunity for investors who were waiting for a nice entry point. We feel that Diomed should be accumulated up to $8.00 per share and over the course of this year has the potential to reach $12.00.

B. February 27, 2002: "Diomed Begins Marketing First Laser System to Treat Both Varicose Veins . . . and Spider Veins"

Diomed came out with an unexpected news release. The announcement is in regards to the release of the first laser system on the market which treats both large varicose veins and the small, unsightly spider veins. . . . Today's announcement expands Diomed's product line, and makes it the first company to market this dual purpose device.

C. March 4, 2002: "The New York Post Features Diomed & Former Prime Minister Joins Company"

Diomed is featured in the business section of the NY Post. The world is [beginning to pay attention to] this company and rightly so . . . Kim Cap, prime minister of Canada, has been named to its board of directors. . . . Diomed is the first company to receive FDA [approval for] the treatment of varicose veins.

D. March 13, 2002: "Diomed in the Spotlight"

This has most certainly been an interesting week for Diomed (DIO). For Diomed investors, it started off with some egg in the face. A very nasty article in the NY Post written by Christopher Byron came just a bit short of deeming the company a fraud. . . . What is a concern to the *SmallCap Digest* is some inaccuracies and misleading information offered by Mr. Byron, who is one of the best business journalists out there. . . . It is imperative that investors conduct proper due diligence on any company before investing. The same could be said for writers before they publish an article.

*SmallCap Network Newsletter Digest* disclosed that it had been paid to publish information about Diomed:

> TGR Group LLC has been paid a fee of $50,000 in cash a [sic] by Mohammed Patel, an individual, for publishing information on Diomed Corp. for a period of one year. (Amended Complaint, Exs. D-G).

### 3. OTC Journal Newsletter

Plaintiffs claim that the investment newsletter *OTC Journal Newsletter* wrote a series of reports about Diomed on February 22, 26, 27, and 28, 2002, and on March 2, 4, 11, 15, and 23, 2002. (Amended Complaint, at ¶ 36). The one report that is attached to the Amended Complaint is dated February 27, 2002, and states:

> "Diomed Makes Major Announcement After the Close"

> Todd Pitcher, analyst with Equity Securities, believes the company can eventually gain a minimum of 10% market [for treatment of varicose and spider veins] penetration. . . .

The *OTC Journal Newsletter* disclosed that:

> MarketByte, LLC has been paid a fee of $100,000.00 in cash and 250,000 options convertible into free trading shares, exercisable at $3.50, by Mohammed Patel, an individual, for publishing information on Diomed Corp. for a period of one year. (Amended Complaint, at ¶ 36).

### 4. Stockwatch

Plaintiffs claim that the investment newsletter *Stockwatch* issued a highly positive report on Diomed, presumably in February of 2002 (no specific date is given). The report stated

"This Virtually Unknown Medical Company Is Poised to Make Huge Profits for Itself and for Fortunate Investors Who Get in Early?" [sic] (Amended Complaint, at ¶ 38).[6]

Plaintiffs allege that all of the above stock promotions were clandestinely instigated by Diomed and Arkoosh.  Based on what plaintiffs describe as "extremely detailed and convincing evidence," the Amended Complaint attempts to lay out a money trail distilled from Diomed's SEC Form 8-K and from statements in various analysts' reports that are said to reveal payments being funneled by Diomed through Verus to the analysts.  As an example, plaintiffs note that the $700,000 that Abraham and Catalyst Communications reported having received "closely approximates" the $750,000 advisory fee paid by Diomed to Verus.  According to plaintiffs, the $50,000 discrepancy is "likely" Catalyst's fee for acting as the "go-between."  (Amended Complaint, at ¶ 51).  In addition, plaintiffs note that the $875,000 budget (mentioned in the *Vancouver Sun* article) "closely matches" the $750,000 Verus received from Diomed, if one also counts the $50,000 annual salary paid to Verus for Arkoosh's "Non-Executive" services and Verus' $15,000 monthly consulting fee.  (Amended Complaint, at ¶ 39).

Plaintiffs allege that the link between Verus and Catalyst Communication is confirmed by a *Dow Jones Newswire* article dated March 21, 2002, which reported that

---

[6]A copy of the *Stockwatch* newsletter is not attached to the Amended Complaint. Rather, plaintiffs attach a copy of a *Vancouver Sun* newspaper article which references the *Stockwatch* report.  According to the *Vancouver Sun* article, *Stockwatch* indicated that it had been paid by Catalyst Communications to promote Diomed's stock, and that Catalyst had been provided a marketing budget of $875,000 and options to buy 350,000 shares of Diomed stock by an "unidentified third party group with interests in Diomed to promote the stock."  (Amended Complaint, at ¶ 38).

> [Larry Abraham of the *Insider Report*] told Dow Jones Newswire that he was approached by Diomed and by Catalyst to write his bullish February report on the company. In phone interviews, Catalyst's owner, Bart Walters, said that a total of $700,000 was spent to hire Larry Abraham, print and produce 800,000 copies of the report and send them out to prospective investors. He said that his firm was paid directly by Verus International – that's right, the same Verus that's not only a major and long-time shareholder of Diomed, but which also since December has been advising Diomed at a cost of $15,000 a month. (Amended Complaint, at ¶ 28, and Ex. B).

In addition, plaintiffs claim, upon information and belief, that the "unidentified group" referred to in the *Vancouver Sun* article is none other than Verus and Arkoosh. They base this allegation on the statement of Bart Walters quoted in the aforementioned *Dow Jones Newswire* article. (Amended Complaint, at ¶ 39).

Finally, plaintiffs link Mohammed Patel, the "person" referenced in the *SmallCap Newsletter Digest* and the *OTC Journal* to Arkoosh. Financial journalist Christopher Byron wrote in a March 11, 2002 *New York Post* article that when he called Verus, Arkoosh came on the line. Arkoosh reportedly told Byron that he "has no idea who or where Mohammed Patel was – though he did say that he 'may have met him casually once or twice.'" (Amended Complaint, at ¶ 30). Plaintiffs claim, upon information and belief, that Mohammed Patel is a mythical "bag man" or "shill" created by the defendants to camouflage the illicit payments to Catalyst Communications and Larry Abraham. (Amended Complaint, at ¶ 37).

According to the plaintiffs, within days of the private placement, the price of Diomed stock rose from $2.00 per share to nearly $9.00 per share. In plaintiffs' estimation, this 450% rise in Diomed's stock price can only be explained by the publication of the analysts' reports. Thereafter, according to plaintiffs, the price of the stock steadily fell, and was

trading at $0.20 per share on the date the initial Complaint was filed.[7,8]  (Amended Complaint, at ¶ 45).  Plaintiffs contend that had they and other members of the class known that the analysts were being paid by Diomed, they would not have bought or held Diomed stock.[9]  (Amended Complaint, at ¶ 44).

<u>APPLICABLE LAW</u>

In reviewing a motion to dismiss, the court will deem the factual allegations of the complaint to be true and will draw all reasonable inferences in the plaintiff's favor. <u>Vartanian v. Monsanto Co.</u>, 14 F.3d 697, 700 (1st Cir. 1994).  A court may, however, in evaluating those allegations look to documents the authenticity of which are not disputed by the parties, to documents that are central to the plaintiff's claim, and to documents that are referenced in the complaint.  <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).  <u>See</u>

---

[7]The daily stock trading data attached to Plaintiffs' Opposition tells a somewhat different story.  They indicates that the price of Diomed stock during the private placement was $1.375 per share.  On February 19, 2002, the date that Diomed began trading on the AMEX, the stock opened at a price of $9.00 per share, and closed at $6.00 per share.  Over the five-week long Class Period, the average opening price was $6.91 per share, and the average closing price was $6.64 per share.  On March 22, 2002, the last day of the Class Period, Diomed stock opened at $4.74 per share and closed at $4.18 per share. (Rosen Aff., Ex. A).  As of February 4, 2005, the stock was trading at $4.31 per share.

[8]Although the closing price on March 3, 2004 was $0.20, I note that this is not an accurate reflection of the stock's performance.  According to the Historical Quote provided by bigcharts.marketwatch.com, Diomed had undergone a stock-split, and the split-adjusted share price was $5.00 per share.

[9]Plaintiff Garvey purchased 500 Diomed shares at $5.19 per share on March 19, 2002; Overhauser purchased 1,000 shares at $7.70 per share on March 5, 2002, which shares he sold on November 4, 2003 at $0.30 per share; Marsh purchased 100 shares at $8.00 per share on March 11, 2002, and 200 shares at $5.45 per share on April 2, 2002; Buck purchased 150 shares at $7.00 per share on March 11, 2002; and Loveless purchased 100 shares at $7.31 per share on March 5, 2002, 600 shares at $6.31 per share on March 7, 2002, and 200 shares at $4.38 per share on March 25, 2002.

Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n.3 (1st Cir. 1991). Dismissal is warranted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Roeder v. Alpha Indus., 814 F.2d 22, 25 (1st Cir.1987), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

The Private Securities Litigation Reform Act (PSLRA) imposes a heightened pleading standard in securities fraud cases. Plaintiffs alleging securities fraud are required to set forth

> [1] each statement alleged to have been misleading, [2] the reason or reasons why the statement is misleading, and [3] if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1).

Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

To state a claim under Section 10(b) and Rule 10b-5, plaintiffs must allege the following elements with particularity: (1) that defendants made a false statement (or omission) of a material fact; (2) with scienter; (3) upon which statement (or omission) plaintiffs justifiably relied; (4) and which reliance proximately caused plaintiffs' damages. See Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir.1996). In a securities context, the First Circuit applies the particularity requirement of Rule 9(b) strictly. New England Data Services v. Becker, 829 F.2d 286, 288 (1st Cir. 1987); Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994). The PSLRA and Rule 9(b) pleading standards are for all practical purposes identical. Greebel v. FTO Software, Inc., 194 F.3d 185, 193-194 (1st Cir. 1999).

General averments of a defendant's knowledge of material falsity are not sufficient. Greenstone v. Cambex Corp., 975 F.2d, 22, 25 (1st Cir. 1992). Consistent with Fed. R. Civ. P. 9(b), the Complaint must set forth "specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading." Id. The Rule requires that the particular "'times, dates, places or other details of [the] alleged fraudulent involvement'" of the actors be alleged. In re Glenfed, Inc. Securities Litig., 11 F.3d 843, 847-848 (9th Cir. 1993) (citation omitted). Plaintiffs who bring claims on information and belief must "set forth the source of the information and the reasons for the belief." Romani, 929 F.2d at 878. "'[A] general averment that defendants 'knew' earlier what later turned out badly'" does not convey the necessary particularity that Rule 9(b) requires. . . . In addition, the heightened pleading requirement of Rule 9(b) applies even when the fraud relates to matters peculiarly within the defendant's knowledge." Gross, 93 F.3d at 991 (citation omitted).

Materiality

A fact is material if there is a substantial likelihood that "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-232 (1988), citing TSC Industries v. Northway, Inc., 426 U.S. 438, 449 (1976). In other words, information will be considered material if a reasonable investor would have considered it important in making an investment decision.

11

With respect to an alleged omission, a finding of materiality is not sufficient in and of itself. There must also be a duty to disclose.[10]

> The materiality of information claimed not to have been disclosed . . . is not enough to make out a sustainable claim of securities fraud. . . . Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it. A duty to disclose 'does not arise from the mere possession of non-public information. . . . Silence, absent a duty to disclose, is not misleading under Rule 10b-5.'

Backman v. Polaroid Corp., 910 F.2d 10, 12-13 (1st Cir.1990), quoting Chiarella v. United States, 445 U.S. 222, 235 (1980).

Scienter

The Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(3)(A). Scienter is "a mental state embracing the intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-194 n.12 (1976). To establish scienter, a plaintiff must show either that the defendants "consciously intended to defraud" or acted with "a high degree of recklessness." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002). Allegations of opportunity and motive, without more, are insufficient at the pleading stage to satisfy the requirements of the PSLRA; a plaintiff must allege conduct from which a jury could infer intentional (or reckless) deception. Geffon v. Micrion Corp., 249 F.3d 29, 35 (1st Cir. 2001).

---

[10]In Roeder v. Alpha Industries, Inc., 814 F.2d 22, 26-27 (1st Cir. 1987), the First Circuit identified three situations that trigger a duty to disclose: (1) when a corporate insider trades on confidential information; (2) when a corporation has made inaccurate, incomplete, or misleading prior disclosures; and (3) when a statute or regulation requires disclosure.

Reliance

Plaintiffs argue that they are entitled to the presumption of reliance that is usually accorded in a failure to disclose case. See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972). (Amended Complaint, at ¶ 58). Reliance is presumed in failure to disclose cases because a plaintiff is generally unable to prove that he relied on something that he did not know. In the alternative, plaintiffs invoke the "fraud-on-the-market doctrine." The underlying theory of the doctrine assumes that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." Levinson, 485 U.S. at 241-242, quoting Peil v. Speiser, 806 F.2d 1154, 1160-1161 (3rd Cir. 1986). In a fraud-on-the-market case

> the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased. When the truth is disclosed and the market self-corrects, investors who bought at the inflated price suffer losses. Those losses can be deemed to have been caused by the defendants' statements, even absent direct reliance by plaintiffs, because the statements were presumptively absorbed into and reflected by the security's price.

Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1218 (1st Cir. 1996) (internal citations omitted).

ANALYSIS

13

As a preliminary matter, defendants argue that the Amended Complaint should be dismissed because plaintiffs have failed to meet the heightened pleading requirements of the PSLRA because they have neither pled with specificity any communications between Diomed and the analysts, nor explained why any such communications as occurred were fraudulent. The PSLRA requires that a Complaint

> (1) specify the time, place, and content of each allegedly misleading statement or omission, (2) explain and provide factual support for why the statement is fraudulent, (3) provide specific factual allegations to support a reasonable inference that adverse circumstances existed at the time of the statements and were known and deliberately or recklessly disregarded by defendants, and (4) *set forth the source of the information and reasons for the belief when allegations are made on information and belief.*

Van Ormer v. Aspen Technology, Inc., 145 F. Supp. 2d 101, 104 (D. Mass. 2000), citing Greebel, 194 F.3d at 193-94 (emphasis added).

While plaintiffs premise the Amended Complaint on a specific asserted fact, namely that Diomed paid Verus $750,000 for financial advisory services, the allegations of a link between that payment and the supposed "secret funneling" of bribes to the stock analysts is based for the most part on third party quotes extracted from newspaper articles. The Amended Complaint is bereft of specific statements or acts attributed to the defendants as opposed to generalities and hearsay-derived speculation. The pleading deficiencies of the Amended Complaint are by themselves a sufficient ground on which to base a dismissal.

Turning first, however, to the merits, there is at the outset a nearly fatal disconnection between the timing of the publication of the analysts' reports and any conceivable influence the reports could have had on the public release of Diomed stock.

14

The private placement took place on February 14, 2002. With one debatable exception, all of the analysts' reports cited by plaintiffs were published at least one week later. Therefore, to the extent that plaintiffs allege that the analysts' recommendations were solicited to boost demand for the initial issuance of Diomed stock, the claims fail as to all of the reports except for the February *Insider Report*, whose exact date of publication is a matter of dispute.[11],[12]

Largely ignoring the timing issue, plaintiffs insist that the 450% increase in the price of Diomed shares during the week following the private placement is proof enough of the defendants' misdeeds.[13] Plaintiffs point to cases finding material falsity where a defendant

---

[11]Defendants note that if it is plaintiffs' intention to claim that Arkoosh's scheme to defraud was devised and implemented prior to the February 14, 2002 private placement, the Amended Complaint must be dismissed for failure to name the proper parties. The SEC documents cited by plaintiffs reveal that Arkoosh was not an officer of Diomed before February 14, 2002, and therefore neither he nor Diomed (on a theory of respondeat superior) could be held liable for actions prior to that date. (Defendants' Reply Memorandum, at 4).

[12]Defendants raise a second timing hurdle faced by plaintiffs. As defendants point out, all but one of the named plaintiffs purchased their Diomed stock after the alleged fraud was brought to light by Christopher Byron in the article he published in the *New York Post* on March 11, 2002. (Defendants' Memorandum, at 5). As a result, they argue that the claims of plaintiffs Marsh, Buck, and Garvey should be dismissed as these plaintiffs could not have relied on any misrepresentations or omissions by the defendants as a matter of law. (Defendants' Memorandum, at 25). Plaintiffs' counterargument is that the *New York Post* is a local newspaper that would not have been available to anyone living outside of the metropolitan New York area. (Marsh and Buck live in Florida and Wisconsin, respectively, and purchased Diomed stock on March 11, 2002, the date the article was published). (Plaintiffs' Opposition, at 27). The argument lacks legs to the extent that plaintiffs rely on a fraud-on-the-market theory. "[U]nfortunately for them, the presumption that the market price has internalized all publicly available information cuts both ways." Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir.1993).

[13]The previously cited stock price data attached to the Amended Complaint do not appear to illustrate anything other than routine fluctuations in the market price of Diomed

has recommended the purchase of a stock without disclosing a hidden conflict of interest. The point is accurate enough insofar as it goes, but plaintiffs consistently misapply the relevant law. All of the cases cited by plaintiffs involve *reporters* or *analysts*, and not *issuers* of stock. Moreover, virtually all of the cases cited involve public prosecutions brought under Section 17(b) of the Securities Act of 1933,[14] a statutory provision which has no application in a private suit for securities fraud.

It may seem odd to the uninitiated, but nothing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock recommendation. Rather, the approach taken by the securities laws – in practical recognition of the fact that most market research is performed by analysts who are paid by brokerage firms, investment banks, and other marketers of securities – is to require disclosure of the fact that the analyst has been paid. As the plain language of Section 17(b) makes clear, the burden to disclose rests on the person who *publishes* the analyst's report; by contrast, there is no duty imposed by the statute on the *issuer* who has paid for the puffery.[15] Thus, in the absence of a duty on the

---

shares. None of the typical indicia of a "pump and dump" scheme is apparent in the data.

[14]Section 17(b) provides: "It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof." 15 U.S.C. § 77q(b).

[15]At oral argument, plaintiffs cited to one case, In the Matter of Dickinson & Co. and T. Marshall Swartwood, 1997 WL 680587 (S.E.C. Release No. 39293), that purportedly held an issuer liable for non-disclosure of payments to analysts. Plaintiffs' interpretation of the case is simply wrong. The defendants in Dickinson were the analyst and two broker-

part of the defendants to disclose the payments at issue, the plaintiffs' claims fail.

Even assuming some viable theory of aiding and abetting, but see Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176 (1994), the claims would still fail because of the disclosures contained in the analysts' reports.  For example, the *Insider Report,* in addition to the disclaimers previously indicated, contained the following cautionary language.

> The *Insider Report* advises all readers and subscribers to seek advice from a registered professional securities representative before deciding to trade in stocks featured in this newsletter. . . . Investing in securities carries a high degree of risk and readers of this newsletter are strongly urged to review all information relative to the company discussed at the company's website diomedinc.com.  Further, readers are urged to review disclosure documents and public filings relating to Diomed at the EDGAR section of the Securities and Exchange Commission website . . . and at the American Stock Exchange website. . . .  All factual information in this report was gathered from sources believed to be reliable but *Insider Report* can make no guarantee as to its accuracy or completeness, *it should be considered advertising and for informational purposes only.*  Use of the material in this newsletter constitutes your acceptance of these terms. (Amended Complaint, Ex. A) (emphasis added).

As an additional example, the *SmallCap Newsletter* contained the following warning.

> All statements and expressions are the sole opinions of the editors and are subject to change without notice.  A profile, description, or other mention of a company in the newsletter is neither an offer nor solicitation to buy or sell any securities mentioned.  While we believe all sources of information to be factual and reliable, in no way do we represent or guarantee the accuracy thereof, nor the statements made herein.  (Amended Complaint, Ex. D).

Plaintiffs characterize these disclosures as "anemic" for their failure to state in so many words that Diomed and Arkoosh were using company funds to carry out a "pump and

---

dealers who caused the report to be published without disclosing that payments had been made to the analyst.  See id. at *2.  The issuer of the stock was not named as a defendant.

dump" scheme. Plaintiffs' Opposition, at 16. According to plaintiffs, the revelation in the *Insider Report*, that Larry Abraham expected "to receive new subscriber revenue" in exchange for his favorable portrait of Diomed would not have alerted an investor that the report was nothing more than an advertisement (as the report characterized itself). I simply disagree. Any reasonable investor told that the publisher of an investment report had received $700,000, $100,000, or even $50,000 to tout a particular stock would give the analyst's recommendation the proverbial grain salt regardless of the source of the funds.

Plaintiffs plead scienter in no less conclusive a fashion. According to plaintiffs, Diomed and Arkoosh acted with "actual knowledge and intention." (Amended Complaint, at ¶ 46). Plaintiffs argue that scienter is determined by the totality of the circumstances, and that when one examines all of the facts in this case, a "troubling image of intentional wrongdoing emerges." Plaintiffs' Opposition, at 22. Plaintiffs point darkly to the facts that Arkoosh owned 131,750 shares of Diomed stock in February of 2002 and that he was CFO and COO of Verus, which owned the largest minority share of Diomed's stock. (Amended Complaint, at ¶ 48). Other than labeling these facts with the caption "Additional Scienter Allegations," plaintiffs do not articulate how Arkoosh's mere ownership of shares in Diomed supports the contention that he acted with the intent to deceive the market.[16]

---

[16]Plaintiffs also contend that if a Complaint alleges a scheme, a material misstatement or omission, or a fraudulent course of business, then "clearly there is a strong inference of scienter." Plaintiffs' Opposition, at 18. This puzzling argument defies gravity by completely ignoring the pleading standards set out in the PSLRA and Rule 9(b). In another nonmeritorious argument, plaintiffs point to the fact that Patrick Kephart, a partner in Catalyst Communications, was charged by the SEC in 1996 for bribing stock brokers as part of an alleged "pump and dump" scheme. (Amended Complaint, at ¶ 52).

As defendants point out, while the reverse merger was completed on February 14, 2002, the registration of Diomed's stock, including the shares of common stock into which Arkoosh's preferred shares were to become convertible, did not become effective until October 24, 2002. (Defendants' Memorandum at 20-21; Diomed Final Prospectus, Form 424B3, filed October 30, 2002). Under Section 5(c) of the Securities Act of 1933, even had Arkoosh wanted to "dump" his unregistered and restricted preferred stock, he was legally prohibited from doing so until October of 2002, seven months after the Class Period ended. (Defendants' Memorandum, at 21; Diomed Holdings, Inc. Form 8-K, dated February 14, 2002; Merger Agreement, Ex. 4.2). In short, if there was pumping, there was no dumping.        Plaintiffs' second attempt to show scienter involves a revisitation of Section 17(b) of the Securities Act of 1933. Under plaintiffs' theory, the defendants' conduct was "intended to evade compliance with [Section 17(b)] by using Verus and Catalyst as conduits for illicit payments to the analysts." (Amended Complaint, at ¶ 50). Plaintiffs argue that Arkoosh's supposed violation of Section 17(b), while not amenable to a private cause of action, is prima facie evidence of his intention to violate Section 10(b) and Rule 10b-5. (Amended Complaint, at ¶ 54). Again, plaintiffs' reliance on Section 17(b) is entirely misplaced. For plaintiffs' argument to have any traction at all, there would have to be some plausible basis for suggesting that Arkoosh had in fact violated Section

---

(An SEC press release announcing the charge is attached to the Amended Complaint). In a similar context, this clumsy effort to prove "scienter by association" the court found to "border[ ] on calumny." In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 171 (D. Mass. 2000).

17(b).  As defendants correctly point out (for a second time), Section 17(b) applies to nondisclosing publishers, and not issuers.

As further evidence of scienter, plaintiffs note that Arkoosh is both a licensed attorney (in Washington state) and a certified public accountant and former partner in a big four accounting firm.  As such, plaintiffs argue that Arkoosh would have been aware that "conspiring to secretly pay stock analysts to publish highly positive reports and issue buy recommendations was a criminal violation of the securities laws."  (Amended Complaint, at ¶ 50).  Whatever the truth of this assertion, it is difficult to understand how Arkoosh's professional status could be considered as evidence of scienter (a deviation from ordinary standards of care so extreme as to support a strong inference that a defendant was aware of the misleading nature of his conduct or so blatant that any reasonable actor would have been aware of the capacity of his actions to mislead).[17]

Control Person Liability under Section 20(a)

To establish a Section 20(a) claim a plaintiff must plead (1) an underlying violation by a controlled person or entity; and (2) that a defendant controlled the violator.  Aldridge, 284 F.3d at 85.  The Section 20(a) claim against Arkoosh founders on the first element. Because plaintiffs have failed to successfully allege a primary violation of Section 10(b),

---

[17]Plaintiffs' final claim is that Verus has a history of engineering reverse mergers in which the stock price of the resulting entity immediately increases on heavy demand, and subsequently plummets.  According to plaintiffs, this "pattern" demonstrates scienter on Arkoosh's part, as he is affiliated with both Verus and Diomed.  (Amended Complaint, at ¶ 55).  As defendants point out in response, reverse mergers are a perfectly lawful securities marketing device. Defendants' Memorandum, at 22.

the derivative Section 20(a) claim fails as a matter of law.[18]  <u>Suna v. Bailey Corp.</u>, 107 F.3d 64, 72 (1st Cir. 2002).

<u>ORDER</u>

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint is <u>ALLOWED</u>.  The dismissal will be entered with prejudice.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[18]It is also doubtful that plaintiffs have successfully alleged the element of control. "To meet the control element . . . the alleged controlling person must not only have the general power to control the company, but must also actually exercise control of the company."  <u>Aldridge</u>, 284 F.3d at 85.  Status as an officer or director does not by itself establish control of an entity, much less status as a "Non-Executive Chairman."  <u>See</u> <u>In re Lernout & Hauspie Sec. Litig.</u>, 286 B.R. 33, 39 (D. Mass. 2002).

21
